# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 1, 2011

No. 10-60679
Summary Calendar

Lyle W. Cayce
Clerk

LATANA WILLIAMS,

Plaintiff-Appellant,

versus

CITY OF TUPELO, MISSISSIPPI,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Mississippi
No. 1:09-CV-102

Before DAVIS, SMITH, and SOUTHWICK, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Latana Williams appeals a summary judgment on her claim of race and

sex discrimination under title VII and 42 U.S.C. § 1983 for her firing from the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-60679

Tupelo Police Department ("TPD"). Because there are genuine disputes of material fact, we reverse and remand.

I.

Williams, a black female, applied for a police officer position with TPD. She had been honorably discharged from the Army and had worked as a corrections officer with the Lee County Sheriff's Department. TPD offered Williams a position conditioned on graduating from the North Mississippi Law Enforcement Training Center (the "Academy"). TPD is the host agency for the Academy, which trains officers from several law enforcement entities in Mississippi. Brian Brown was the director of the Academy, and Scott Speaks was a full-time instructor.

The Mississippi Board of Minimum Standards (the "Board") dictates minimum passing grades for academic performance, physical fitness, firearms, defensive driving, defensive tactics, first aid, and cardiopulmonary resuscitation. The city acknowledges that Williams passed many of those subjects, and Speaks said that at the beginning of her training, "Williams was doing fairly well. She outdid several cadets." The dispute, however, arises from Williams's skills with firearms and defensive driving and her allegations that Speaks, and to a lesser extent other TPD officers and instructors, prevented her from graduating from the Academy because they did not want a black female officer at TPD.

In addition to Williams, the cadet class consisted of sixteen men: three black and thirteen white. Since 2004, TPD has hired seven black males, including the three in Williams's class, but no black females. Only one black woman has graduated from the Academy since 2004, and she was not a TPD hire. From Williams's class, nine cadets–all white males–graduated.[1]

---

[1] Of the three black males, two left voluntarily, and the third was not allowed to return
(continued...)

No. 10-60679

According to Williams, during her training Speaks told her that she would not pass the Academy, that he would do everything he could to get rid of her, and that he hoped he never had to see her face again.  He said that he hated the thought of someone like Williams protecting his wife and kids.  Another cadet, Stanley Lee, corroborated Williams's claim that Speaks told Williams that she would never be a part of his family and that if she did make it through the Academy, he and his brothers would not back her up.  Although Speaks denies he made some of those statements, such as the one Lee corroborated, he admits to generally being tough on Williams to motivate her through "reverse psychology"– a tactic other cadets noted in depositions.  Williams, however, characterized Speaks's motivational comments another way:  He was harsh on the men, yet encouraged them often, saying things like "good job, buddy," but he never encouraged Williams and repeatedly urged her to quit.  Williams also claims that the forms cadets filled out if they wanted to quit the Academy were often left on her desk during class breaks.

To pass the firearms test, a cadet must shoot several qualifying scores after training.  If a cadet is having problems that cannot be cured by brief suggestions from an instructor in a group setting, he may receive "remediation," or one-on-one instruction.  Remediation is available for any subject, not only firearms, but if a cadet has too many remediations, the Academy considers him to have failed the subject regardless of whether he ultimately passes the qualification test.[2]  A cadet has five attempts to pass firearms.

During firearms training, Williams was admittedly having problems and

_____

[1] (...continued)
following documented medical leave.

[2] The Board states that a cadet who fails firearms on the first try should receive remedial training and may have not more than five attempts at passing.  The Board does not clarify a maximum number of remediations and leaves it to each academy to determine what it considers remediation.

No. 10-60679

failed her first four attempts.[3]  She received seven remediations before quali-fying on her fifth try.  During her sixth remediation, however, her instructor no-ticed that the gun she was issued was too large for her hand.  Williams used the smaller gun in her seventh remediation, then shot her fifth qualifying shots with 80-90% accuracy.[4]  She claims that a white male cadet, Bradley Hodge, also re-quired remediation and qualified around the same time she did, about a week after the rest of the group.

The cadets also learn defensive driving and must pass both a day course and a night course to qualify.  Because cadets are required to use cars provided by their own agency, Williams notified her sergeant at TPD, Robert Carnathan, that she needed a car for the course.  Carnathan told her he would drive the car to the Academy for the first day of defensive driving, but he never arrived.

Williams's instructors offered her a "junker" car that sat behind the Acade-my barracks.  No one had driven it for several months, and Williams needed to jump it before it would start.  During her practice runs, she complained that the car was not accelerating properly, but she still received numerous remediations.[5]  She complained that during these remediations she received conflicting direc-tions from instructors and felt as though they were trying "to make it as difficult

---

[3] Williams suggests that she was in fact hitting the targets during her first four at-tempts but that after Speaks graded the targets out-of-sight, he claimed she had failed.  In her deposition, however, Williams agreed that changing the size of the pistol made a big difference and that she was making other technical errors, such as "milking" the grip.

[4] The city apparently does not dispute that Williams eventually passed, but there is no record of the targets from her fifth qualification attempt, only the initial targets from her un-successful first four attempts.  Speaks claims that he did not retain the targets because he had considered Williams to have already failed firearms, because she did not pass on her first four tries, despite the fact that the Board provides that a cadet has five attempts to pass.  Further, the rest of the class was told that Williams did pass firearms, and neither Speaks nor Brown told Williams that she had failed firearms.

[5] Some of the remediations, according to Williams's testimony, appear to be unneces-sary:  One was to teach her how to back up in an S-curve, but she did not need to back up in an S-curve to pass the course.

No. 10-60679

as possible" for her.  After her platoon leader drove with her and informed the instructors that there was no way Williams could pass the course with that car, she was allowed to use another cadet's car and passed the day course.[6]  Although the city contends that Williams still struggled with the new car, it notably does not allege that she needed additional remediations.

In regard to the night course, Williams alleges that she did the three standard practice runs and passed the qualification run on her first try without hitting any cones.  She stated that she needed no remediations and that Brown told her at the off-site driving course that she had passed.  When the cadets returned to the Academy, Brown and Speaks told Williams that someone had timed the course using a second clock, and according to that clock she had failed.  They also told her that she had hit some cones during her run.

Speaks testified that he could not remember anything about "a second clock," despite the fact that he was at the course site, and that Williams did "technically pass," but he failed her only her because she needed so many remediations.  Brown testified that he could not remember who kept time on a second clock and that he never actually saw Williams hit any cones.  Further, despite Williams's assertion that she needed no remediations, the Academy documented that she did need remediations for the night run.

Brown and Speaks then informed Chief Chaffin that because Williams could not pass firearms or defensive driving without significant remediations, she was not qualified to be a police officer.  Chaffin set up a meeting with Brown and Speaks and three TPD majors to discuss Williams.  At the meeting, Speaks and Brown told the four officers that Williams could neither shoot accurately nor

---

[6] When she finished the course, Williams claims that her platoon leader told her she had finished in plenty of time, but when Williams asked Speaks whether she passed, he did not respond to her and walked away.  Her platoon leader told her that Speaks had told him that Williams did not pass.  When Williams received her score sheet, it showed a passing score.

No. 10-60679

drive safely and that she had exceeded the number of remediations they felt were appropriate. They recommended that, for the safety of the citizens of Tupelo and for Williams herself, TPD should dismiss her from the Academy and terminate her employment.

The officers at the meeting were not told about Williams's having changed her weapon right before qualifying or having to use the junker car for the majority of her driving. Chaffin and the three majors, on the information supplied by Speaks and Brown, agreed that Williams should be dismissed. Williams was given the opportunity to resign, and when she refused, Chaffin fired her. She went on to become a police officer for Grenada, Mississippi, after graduating from a different academy.

Williams sued.[7] The district court granted the city summary judgment, finding that Williams had failed to prove with substantial evidence that the city's nondiscriminatory reason for its decision––that Williams did not meet the minimum standards to be certified as a police officer––was a pretext for race discrimination.

## II.

"We review [a] summary judgment *de novo*." *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 2011 U.S. App. LEXIS 461, at *10 (5th Cir. Jan. 7, 2011) (citing *Croft v. Governor of Tex.*, 562 F.3d 735, 742 (5th Cir. 2009)). Summary judgment is appropriate if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

---

[7] In her Equal Employment Opportunity Commission charge, Williams alleged discrimination based on race and sex, but she claimed only race in her complaint. In its motion for summary judgment, the city argued for dismissal of both the race and sex discrimination claims, so the district court addressed both in its opinion. The parties note that inconsistency in their briefs, yet neither objects to considering Williams to have raised both race and sex discrimination claims. Because the analysis is the same and the district court addressed the issue, we will also confront the claim of sex discrimination concurrently with race.

No. 10-60679

CIV. P. 56(a).  The movant has the burden of showing that summary judgment is proper, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and we view the evidence in the light most favorable to the non-moving party, making all inferences in its favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.* 530 U.S. 133, 150 (2000).

Absent direct evidence, we analyze claims of racial and sex discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The burden is on the plaintiff to make out a *prima facie* case of racial discrimination, *id.* at 802, by showing (1) he belongs to a protected class; (2) he applied and was qualified for the job sought; (3) despite his qualifications, he was rejected; and (4) after his rejection, the position was filled by someone not in the protected class, *Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 468 (5th Cir. 2001).  If the plaintiff can establish a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802.  If the employer meets that burden, the burden shifts to the plaintiff to prove that the proffered reason is a pretext for the real discriminatory purpose. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

Williams has presented sufficient evidence for a *prima facie* case.  She is a black woman who applied to become a TPD officer, was qualified for the position according to her version of her training, was dismissed from the Academy despite her qualifications, and was replaced by a white male, Jason Whitlock. The city responds that even though Williams may have passed firearms and defensive driving, she required too many remediations and that in the subjective opinion of the officers, she posed a serious risk to herself and others if she were a police officer.

The burden shifts to Williams to show that "the evidence taken as a whole

7

No. 10-60679

(1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [race or sex] was a determinative factor in the actions of which plaintiff complains." *Pratt v. City of Houston, Tex.*, 247 F.3d 601, 606-07 (5th Cir. 2001) (internal quotation marks omitted) (quoting *Vadie v. Miss. State Univ.*, 218 F.3d 365, 373 (5th Cir. 2000)). In *Pratt, id.* at 607, we reversed a summary judgment because the employees presented evidence questioning whether they were prevented from completing the hiring process, whether they were more qualified than the other candidates, whether the successful candidate received special treatment, and whether the employer had discriminated on previous occasions.

In contrast to *Pratt*, in which the employer selected one white candidate from a large pool and passed over more qualified black applicants, here we cannot look to whether one cadet was more qualified than another, because all were conditionally hired and only had to pass the Academy to become officers. Instructive, however, is how *Pratt* treated evidence of the hiring process and preferential treatment. There, the evidence was largely the word of the employer against that of the employee, with the employee's allegations corroborated sparingly. Looking at the evidence as a whole, the court determined––because of the factual disputes––that "it is for the jury to further decide the ultimate question of whether the [employer] denied either one of these plaintiffs the promotion because of their [*sic*] race." *Id.*

Viewing the evidence in the light most favorable to Williams, there are genuine disputes of material fact as to whether too many remediations were required for her to pass her training and whether the real reason that Speaks and Brown recommended dismissal was that they did not want a black woman working with them at TPD, which has not hired a black woman as a police officer

8

since 2004.[8] Speaks made numerous disparaging remarks to Williams yet encouraged the white cadets. Lee corroborated that Speaks had threatened Williams that if she ever did pass the Academy, he and his brothers would not back her up on the streets, a troublesome remark in law enforcement, where officers must depend on one another for support in life-threatening situations. "Quit forms" mysteriously appeared on Williams's desk but on no one else's.

Williams has also raised a dispute as to whether she was prevented from completing her training. The gun TPD issued her was too large for her hand, according to an Academy instructor, yet the qualification tests she shot with the first gun and resulting remediations were held against her. TPD did not provide her with a suitable car for training, even though Carnathan told her he would bring one. Her initial qualification drives and resulting remediations in the malfunctioning car (some of which drives she alleges were unnecessary or denies even doing) were held against her. When she passed both the day and night courses in a new car, borrowed from a different police department, the instructors told her she had failed, although now they testify that she actually passed. As to the "second clock," Speaks, who allegedly told Williams that she failed according to a second clock, does not remember there being a second clock, and Brown, who originally told Williams she passed, has no recollection of who timed her with the other clock.

Most importantly, Brown and Speaks did not inform Chaffin and the majors about the new gun and car when they stated that Williams needed too many remediations to qualify and recommended that TPD dismiss her from the Academy. No cadet has ever been involuntarily dismissed from the Academy. Fur-

---

[8] The city notes that it has hired black men and white women, but "discrimination against black females can exist even in the absence of discrimination against black men or white women." *Jeffries v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980).

ther, Williams went on to graduate from a different police academy in Mississippi with similar requirements, supporting her position that she was a qualified candidate.

The evidence taken as a whole creates significant fact issues as to whether the city's stated reasons were what actually motivated it to fire Williams, and that evidence creates a reasonable inference that Williams's race and sex were determinative factors.  There are conflicting descriptions of a muddled set of facts,[9] and we may not make credibility determinations to take the word of the city over Williams's regarding her training.

Although summary judgment was not appropriate, we express no view on the ultimate merits of Williams's claims.  The summary judgment is REVERSED, and this matter is REMANDED for further proceedings as the district court may deem appropriate.

---

[9] In addition to those inconsistencies already mentioned, there are others regarding the city's allegations that Williams failed other portions of her training: physical fitness, a domestic-dispute simulation, and a shoot-out simulation.  As the district court found, there is a factual dispute as to whether Williams lagged in physical fitness.  The city claims she was slower than all the men, but her entry level scores, the lowest she received, were 77%, 76.5%, and 72.5%, and a 70% was required to pass.  Speaks cannot explain why her score sheet says that the average of those three tests was shown as 69%.

As to the domestic-dispute simulation, Williams claims she was told that the activity was not being graded, and she disputes the city's version of the facts.  As for the shoot-out simulation, Williams, Speaks, Brown, and the other cadets watching the simulation have different versions of the events:  Some say Williams froze in her car and allowed the shooter to trap her inside the car, others say that she ran around to the back of the car shooting wildly, and Williams states that she got behind the engine block for protection—as she had been taught.  Regardless of the factual disputes, none of those factors was communicated to Chaffin and the majors as reasons to dismiss Williams.