# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-31269

United States Court of Appeals
Fifth Circuit

**FILED**

November 10, 2014

Lyle W. Cayce
Clerk

YOUNG BUISSON,

      Plaintiff - Appellant

v.

BOARD OF SUPERVISORS OF THE LOUISIANA COMMUNITY AND
TECHNICAL COLLEGE SYSTEM,

      Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:12-CV-2008

Before JOLLY and JONES, Circuit Judges, and GODBEY\*, District Judge.

PER CURIAM:\*\*

This is an appeal from a grant of an employer's motion for summary judgment, rejecting claims of race-based employment discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.* We AFFIRM in part, VACATE in part, and REMAND.

---

\* District Judge of the Northern District of Texas, sitting by designation.

\*\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-31269

## I. Background

Plaintiff Young Buisson, an Asian-American with South Korean origin, taught chemistry at Delgado Community College from January 2009 to July 2011. The defendant, Board of Supervisors of the Louisiana Community and Technical College System ("the Board"), serves as the management board of Delgado Community College ("the college").

### a. Buisson's Employment

From August 2010 until April 2011, Buisson taught at the college and reported to Raymond Duplessis, the Chair of the college's Physical Science Department. From April to July 2011, Buisson reported to Bereket Tewolde, the college's Lead Chemist. Both Duplessis and Tewolde reported to Dean Thomas Gruber.

Dean Gruber did not make all hiring decisions. Duplessis was able to hire whom he wanted. And, when he had a choice, Duplessis only promoted black instructors.

Buisson received excellent performance evaluations before Duplessis and Tewolde became her supervisors. Buisson's classes filled quickly, and enrollment in her courses sometimes increased as the semester progressed. Buisson was promoted during the course of her employment, and Dean Gruber assigned Buisson an intensive teaching course in May 2011. When he assigned that course, he said, "[Y]ou are the only one who can handle this course." Dean Gruber also gave Buisson responsibility for developing the college's Chemistry Technology Program. During the time period relevant to this case, Buisson received one low performance evaluation.

**b. Duplessis's Behavior**

While Buisson was employed at the college, Duplessis called Buisson, who is of Asian descent, a "chink" and inflicted daily acts of "personal pain and degradation" on Buisson. Instructors also observed Duplessis treat Buisson and other non-black instructors less favorably than black instructors. Examples of Duplessis's less favorable treatment include (1) providing unfavorable work schedules to non-black instructors; (2) forwarding student complaints regarding non-black instructors directly to Dean Gruber while handling student complaints regarding black instructors himself; (3) allowing academic freedom to black faculty while disallowing such freedom to non-black faculty; and (4) interrupting and disrupting non-black faculty during class but not disturbing black faculty during class.[1] One instructor stated in a sworn declaration that Duplessis "target[ed] certain people, primarily non-[black] workers causing them great mental pain and creating a work environment that . . . could . . . be called racist." "By the nature of the actions and interactions with" Buisson, Duplessis "wanted [her] gone."

Between August 2010 and July 2011, Duplessis subjected Buisson and other non-black faculty members to many instances of unwelcome and irritating behavior. In particular, Duplessis was rude to Buisson. He removed her name plate from her office. On many occasions, Duplessis removed the notes that Buisson left on her office door to communicate with her students. One instructor said that the only reason to do this would be to "interrupt and degrade [Buisson's] daily work."

Duplessis "snoop[ed] around Buisson's office and classroom like he was spying." He also used his cousin as a spy to gather information. Duplessis

---

[1] Duplessis also made one non-black instructor give higher grades to black students.

3

interrupted Buisson's classes "all the time and made unbearable noises."[2]  He used Buisson's computer without permission and had full access to her personal files.  Duplessis also tampered with Buisson's computer to block inter-office email and school communications.[3]

He also left Buisson and other non-black instructors off of email notifications and inter-office communications.  Duplessis did not remove these non-black instructors from every email; instead, he failed to send those emails that were most likely to cause damage to the instructors' reputations.  For example, after leaving Buisson off of an email reminding faculty of the deadline for submitting mid-term grades, Duplessis accused Buisson of missing that very deadline.  In May 2011, Buisson brought at least one of these email-exclusion incidents to Dean Gruber's attention.  Thereafter, Duplessis forged an email to hide the fact that he had not sent the grade-deadline email to Buisson.  Dean Gruber provided grievance forms to Buisson for her use if she wanted to file a grievance against Duplessis for the forged email.  There is no indication that Buisson filed a grievance.

Duplessis left a list of Buisson's prior course offerings, which included Buisson's confidential faculty identification number and confidential information pertaining to her students, unattended on a public printer.[4]

Duplessis also solicited a complaint letter against Buisson from one of her students.  And, he lied to Dean Gruber about Buisson, telling him that Buisson violated the college's "open door" policy by leaving the chemistry lab door closed.  As a result, Dean Gruber singled out Buisson for violation of the

---

[2] Buisson began reporting these interruptions to Dean Gruber in the spring of 2011.

[3] Duplessis erased computer files of another non-black instructor just before that instructor needed to turn his grades in to the main office.  There is no indication that Buisson knew of this other computer-tampering incident.

[4] Buisson complained to Dean Gruber about this incident.

chemistry lab's "open door" policy, even though other instructors also violated the policy.

Duplessis stole Buisson's books and the books of other non-black instructors, and he provided a bookshelf or file cabinet to all full-time faculty except Buisson and two other non-black faculty members. After relocating many chemistry lab materials, Duplessis told all faculty, except Buisson, of the relocation. Duplessis ignored Buisson's suggestions about Chemistry Department issues, such as the use of closed-toed shoes.

Duplessis allowed faculty members flexible working conditions such as ending their semesters several weeks early but denied these conditions to Buisson. He also assigned chemistry courses at the college without giving Buisson a choice in her assigned courses. And, the one day that Buisson brought her child to work, Duplessis sent an email to all instructors stating that children should not be unattended at the college—even though Duplessis and his wife, also a professor, had violated that policy several times.

Duplessis told Buisson that she would be paid for teaching an extra course. After she taught the course, Buisson was not paid. She complained to Dean Gruber, who said he would tell Duplessis to arrange the payment. Duplessis refused to authorize the full payment and would only agree to pay approximately sixty percent of the promised rate.

The day before Buisson interviewed for a full-time, permanent faculty position in the fall of 2010, one of her students sent an email complaint to Duplessis. Duplessis forwarded this email to Dean Gruber, who told Duplessis to ask Buisson for a response. Duplessis failed to inform Buisson of the complaint until after the first round of interviews was completed; thus, Buisson had no chance to defend herself during her initial interview.

No. 13-31269

### c. Altercation with Tamika Duplessis

In June 2011, Buisson and professor Tamika Duplessis, the wife of Duplessis and Buisson's officemate, had a verbal altercation that made Buisson fear for her safety. After the incident, Tamika Duplessis filed a grievance against Buisson, and the parties had a pre-grievance meeting. After that meeting, Duplessis (the husband) came to Buisson's office and told her to move out of the office, "harassed Buisson a tremendous amount," and then told Buisson that he would call the police if she did not move out. When Buisson refused to move offices, Duplessis asked for, and received, Dean Gruber's permission to order Buisson's relocation. The parties never had a final grievance hearing because Buisson's employment was terminated in July 2011. Tamika Duplessis was not subjected to any adverse action based on the verbal altercation with Buisson.

### d. Promotions in 2010

In the fall of 2010, the college had two permanent, full-time, chemistry-faculty vacancies. Buisson and six other applicants applied for the openings and endured two rounds of interviews. In the first round, a seven-member hiring committee interviewed the applicants. The committee asked each applicant a set of standard questions and graded the applicants on fixed criteria, with each committee member ranking the quality of the answers and interpersonal skills on a 100-point scale. Buisson received the fourth-best rating from the first round of interviews.

In the second round of interviews, Dean Gruber asked questions, and Duplessis observed without asking questions. Buisson performed well in her second interview. Nevertheless, Dean Gruber hired the two applicants who received the highest rating from the first set of interviews. Both hired applicants were black.

At least one faculty member was told by several people that he should not apply for an open faculty position because hiring decisions were decided before the hiring committee ever met.

### e. Termination in 2011

In June 2011, Dean Gruber offered Buisson a permanent faculty position. Shortly thereafter, in July 2011, Dean Gruber terminated Buisson's employment. When asked for a reason, Dean Gruber stated that he had "no reason" and that he would give Buisson a "good recommendation and referral if needed." Dean Gruber found a black instructor to cover Buisson's classes. Duplessis told an instructor that Buisson's employment was terminated due to grade inflation, while Tewolde told that instructor that the termination was for "fighting with . . . Duplessis's wife."

In an affidavit prepared for this case, Dean Gruber provided several other reasons for his decision to terminate Buisson's employment: having a teaching style that was inappropriate for a two-year college; being unable to motivate less capable students; failing to understand the difference between knowing a lot and imparting that knowledge to students; prioritizing completion of her syllabus over instructing students; complaining about instructors; being difficult to understand in the classroom; creating a high-stress classroom atmosphere; discussing students with other students; being more concerned about other faculty than her own self-improvement; creating a stressful work environment by constantly criticizing her peers; inflexibility in working with others; and having a personality and teaching style that made students avoid her class and result in decreased enrollment for her courses.

No. 13-31269

**f.  Other Miscellaneous Actions**

There are several other facts pertaining to Duplessis that either occurred after Buisson's employment was terminated or were not revealed to Buisson before that termination.  In particular, Duplessis called Buisson, who is of South Korean origin, "Kim Young" and also showed animus by calling an Indian-origin instructor, Syed Ahmed, by the name "Ahmedinejad."  He also made a remark based on an Italian-based stereotype when interacting with an Italian-origin instructor.

Duplessis also threatened to fire a non-black instructor "just like he did with . . . Buisson."  Tewolde warned that same professor that "Duplessis will run [you] out of [the college] the same way he got rid of Dr. Buisson."

Duplessis told a non-black instructor that he moved the Physical Science Department to a different building because that building housed more black people and he wanted to be with "his people."  After President Obama was re-elected in late 2012, Duplessis wore an Obama t-shirt to the college and told a non-black instructor, "[W]e have a black president, a black chancellor, a black math chairman, and I am black. . . . [T]here is no more White House; it is now the Black House."

## II. Procedural History

Based on these allegations, Buisson filed a charge with the EEOC, which subsequently issued a Notice of Right to Sue.  Buisson then filed the instant complaint against the Board in the district court.  In her complaint, Buisson alleged that the Board violated Title VII of the Civil Rights Act of 1964 by engaging in discrimination based on race and national origin, fostering a hostile work environment based on the same characteristics, and retaliating

No. 13-31269

against her for engaging in protected conduct.[5]    After discovery, the Board filed a motion for summary judgment seeking a dismissal of all claims.  The district court granted the Board's motion and dismissed all of Buisson's claims with prejudice.   Buisson filed this appeal.

## III. Discussion

### a.  Discrimination

Title VII race- and national-origin-based discrimination claims, such as those at issue here, are evaluated under the *McDonnell Douglas* burden-shifting framework.  411 U.S. 792, 802–04 (1973).  Under that framework, a plaintiff must establish that she (1) is a member of a protected group; (2) was qualified for the position at issue; (3) suffered an adverse employment action, such as termination of her employment; and (4) was replaced with someone outside her protected group or was treated less favorably than other similarly situated employees outside the protected group.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).  If the plaintiff makes this prima facie showing, the burden shifts to her employer to produce evidence of a legitimate, non-discriminatory reason for the adverse employment action.  *Id.* at 557.  If the employer articulates a legitimate reason for the adverse employment action, "the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory . . . purpose." *Id.*; *see also Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011) (describing mixed-motive analysis).

Buisson alleges four adverse employment actions:  a poor performance evaluation, non-payment for a course she taught, failure to promote her in the

---

[5] Buisson also brought age-based discrimination claims; however, she voluntarily dismissed those claims in the district court.

fall of 2010, and termination of her employment in the summer of 2011. With respect to the first two employment actions, we affirm the district court's grant of summary judgment in the Board's favor. Buisson's poor performance evaluation was not an adverse employment action, so the Board is entitled to summary judgment for that action. *Cf. Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (noting that an adverse employment action "consists of *ultimate employment decisions* such as hiring, granting leave, discharging, promoting, [demoting,] and compensating" and must "affect job duties, compensation, or benefits" (quotation marks omitted)). The record does not reflect that black persons were paid more for similar course assignments or that the Board's explanation for the non-payment was pretext for race-based discrimination. Thus, the Board is entitled to summary judgment for that action. *Cf. McCoy*, 492 F.3d at 556.

With respect to the final two employment actions, the district court erred in granting summary judgment to the Board. Viewed in Buisson's favor, the evidence supports a prima facie case of race-based discrimination regarding Buisson's failure-to-promote claim: She was a non-black, non-African person qualified for the permanent, full-time, faculty position and was passed over for promotion to positions that were ultimately filled by black persons. The Board, in turn, provided evidence of a legitimate, non-discriminatory reason for the college's decision to promote the black applicants: Dean Gruber gave great weight to the hiring committee's ranking of the applicants after their initial interviews. However, viewed in Buisson's favor, there is evidence that this reason is pretext for discrimination. In particular, Duplessis harbored racial animus for non-black employees and was present for the second round of interviews. He also solicited student complaints against Buisson and forwarded Dean Gruber one such complaint on the eve of Buisson's first interview. Duplessis then ignored Dean Gruber's directive to inform Buisson

of the student's complaint, denying Buisson the opportunity to respond to the charge. Duplessis waited more than two weeks to inform Buisson of the student complaint, providing it to Buisson shortly before her second interview.

The record is replete with evidence that Duplessis harbored pro-black sentiments in the context of his position, often in derogation of those who were not black. A jury could infer—certainly from the record as a whole and also from specific remarks and actions involving Buisson—that Duplessis's actions were a successful, race-based attempt to sabotage Buisson's chances at a promotion. A jury could also infer that Duplessis had access and opportunity, through his presence at the final interview, to exert influence over Dean Gruber and obstruct Buisson's promotion. *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) ("To invoke the cat's paw analysis, [a plaintiff] must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker possessed leverage, or exerted influence, over the titular decisionmaker." (quotation marks omitted)). Moreover, Buisson's affidavit supports the inference that Dean Gruber did not make all hiring decisions and that Duplessis effectively made the promotion decision here. Thus, a jury could infer that Duplessis was the effective decision-maker for the promotion process, and his decision not to hire Buisson was based on her race or national origin. Consequently, the Board is not entitled to summary judgment on this claim.

Viewed in Buisson's favor, the evidence also supports a prima facie case of race- or national-origin-based discrimination regarding Buisson's termination claim: She was a non-black, non-African person qualified for the faculty position she held; yet, her employment was terminated and her position was filled by a black person. The Board, in turn, provided evidence of several legitimate, non-discriminatory reasons for the decision to terminate Buisson's

employment, all of which were principally based on Buisson's workplace personality or teaching style.  But, as with the failure-to-promote claim, there is evidence that these reasons are pretext for discrimination.  First, Dean Gruber's initial reason for his termination decision was "no reason," which contradicts the reasons he gave after Buisson filed suit.  Second, two supervisor-level faculty gave two additional, and different, reasons for the termination decision—yet another contradiction.  Third, and perhaps, most important, just prior to his decision to terminate Buisson's employment, Dean Gruber promoted Buisson.  Based on this promotion decision, a jury could infer that Dean Gruber did not believe that Buisson had a poor workplace personality or teaching style—but, in fact, thought that Buisson positively contributed to student education at the college.  A jury could also infer that Dean Gruber's evolving and contradictory reasons for terminating Buisson's employment are pretext for discrimination.  *Cf. Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1307 (11th Cir. 2012) ("[A] contradiction of the employer's proffered reason for the termination of an employee is sometimes enough, when combined with other evidence, to allow a jury to find that the firing was the result of unlawful discrimination."); *Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 546 (5th Cir. 1996) (noting that evidence that an employer has given a false reason for terminating employment may contribute to a determination that the reason was pretext for discrimination); *cf. also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

### b. Hostile Work Environment

To establish a race- or national-origin-based, hostile-work-environment claim under Title VII, a plaintiff must prove (1) she belongs to a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based on her membership in the protected group, (4) the harassment affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). For harassment to affect a term, condition or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quotation marks omitted). To determine whether harassment is so severe or pervasive that it alters the conditions of the plaintiff's employment, this Court considers a number of factors: "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating (or whether it is a mere offensive utterance), and whether it unreasonably interferes with the victim's work performance." *Id.*

We affirm the district court's grant of summary judgment in the Board's favor on this claim. The evidence does not reveal harassment that was so severe or pervasive that it altered the conditions of Buisson's employment. Most of the incidents, while perhaps offensive or annoying, are not evidence of race- or national-origin-based harassment. *See Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 163 (5th Cir. 2007) ("Title VII . . . is not a 'general civility code,' and 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998))). The incidents do not rise to the level of

severity or pervasiveness required to support a hostile-work-environment claim. None of them involved physically threatening or humiliating conduct, as opposed to offensive utterances. And, Duplessis's use of the bigoted term "chink" was isolated.[6] Its utterance indicates Duplessis's discriminatory intent; however, its one-time utterance is insufficient—even when combined with Duplessis's other behavior—to create a race- or national-origin-based, hostile work environment. The comment pales in comparison, both in severity and frequency, to the kinds of verbal harassment that this Court and other circuits have held would support a Title VII, hostile-work-environment claim. *Compare Walker v. Thompson*, 214 F.3d 615, 619–22 (5th Cir. 2000) (holding that a hostile work environment claim survived summary judgment where evidence demonstrated years of inflammatory racial epithets, including "nigger" and "little black monkey"); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1266 (7th Cir. 1991) (holding that the plaintiff survived summary judgment where the plaintiff was subjected to "nigger jokes" for a ten-year period and the plaintiff's workstation was adorned with "a human-sized dummy with a black head"); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182 (4th Cir. 2001) (reversing summary judgment where the plaintiff suffered "incessant racial slurs" including "nigger" and "dumb monkey"), *with Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (finding that the evidence was insufficient to establish a hostile-work-environment claim where a supervisor's comments about inner-city "ghetto children" ceased upon plaintiff's request, and the supervisor's other arguably racially offensive comments were "isolated incidents"). Moreover, Buisson has offered no

---

[6] There is no indication that Buisson was aware of Duplessis's other bigoted statements during her employment. Therefore, those events cannot support Buisson's hostile work environment claim.

evidence that Duplessis's annoying acts or his bigoted comment prevented her from doing her job, and the facts do not support such an inference.

In sum, the evidence is insufficient to support Buisson's hostile-work-environment claim, and, thus, the district court properly granted the Board's motion for summary judgment on this claim.

## c. Retaliation

A plaintiff establishes a prima facie case of retaliation under Title VII by showing that (1) she participated in a protected activity, (2) she suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action. *Stewart v. Miss. Trans. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009). "Summary judgment is appropriate if the plaintiff cannot support all three elements." *Id.*

The Board is entitled to summary judgment on this claim because Buisson has not shown that she engaged in a protected activity. She reported some of Duplessis's annoying behavior to Dean Gruber; however, there is no evidence that she indicated that these otherwise, non-race-based incidents were motivated by race or national origin. And, there is no evidence that Dean Gruber was aware, or should have been aware, of Duplessis's bigoted remarks. Without evidence that Buisson engaged in a protected activity, the Board is entitled to judgment as a matter of law.

## IV. Conclusion

For the reasons above, we VACATE the district court's grant of summary judgment on Buisson's failure-to-promote and termination claims. We AFFIRM the district court's grant of summary judgment on all other claims. We REMAND to the district court for further proceedings not inconsistent with this opinion.

No. 13-31269

VACATED in part, AFFIRMED in part, and REMANDED.