# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 3, 2023

Lyle W. Cayce
Clerk

No. 21-30482

Magan Wallace,

*Plaintiff—Appellant*,

*versus*

Performance Contractors, Incorporated,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:19-CV-649

Before Davis, Elrod, and Haynes, *Circuit Judges*.
Jennifer Walker Elrod, *Circuit Judge*:

Magan Wallace worked for a construction company. She sued under Title VII alleging sex discrimination, sexual harassment, and retaliation. The district court granted summary judgment to the construction company. Because we conclude that Wallace has raised genuine material fact issues on each claim, we REVERSE and REMAND.

I.

Performance Contractors is a construction company that was contracted to work at a chemical manufacturing complex. Performance hired

No. 21-30482

Magan Wallace in December 2016, laid her off as part of a reduction in force in April 2017, then rehired her shortly thereafter. Though Performance hired Wallace in her first stint as a "laborer," it hired her as a "helper" in her second stint. This was considered a promotion: at Performance, laborers do administrative work and keep the job site clean while helpers have a more hands-on role, following pipefitters and welders around the construction site to help with construction. In that role, helpers work either on the ground or "at elevation." Though laborers technically can work at elevation, only those with prior experience who express interest get to work at elevation. In practice, only helpers work at elevation. Wallace was the only female "helper" in her designated area.

Matthew Gautreau and Luke Terro, employees at Performance, recommended Wallace for the helper position. They were both previously Wallace's supervisors; Gautreau was an area manager, while Terro was a superintendent. Gautreau's job was to manage personnel and safety in the area of the worksite where Wallace worked. Gautreau supervised Terro; Terro, as a superintendent, supervised Charles Casey (a general foreman); Casey supervised Kris Tapley (Wallace's husband); and Tapley was Wallace's direct supervisor. Each of them at times supervised Wallace.

Before working at Performance, Wallace had worked for another construction company where she was allowed to work at elevation. Wallace claimed that she wanted to work at elevation at Performance to improve her skills because advancements would bring pay raises and advance her in her craft.

When Wallace started as a helper in her designated area, however, she was not allowed to work at elevation. Casey, the area's general foreman, told her in front of others that she had "t***" and an a**" and thus could not work at elevation. He further stated that women were not allowed "on the rack"

2

(i.e., scaffolding) because Performance did not have harnesses that fit women.  He also said on another occasion, when doling out assignments to various helpers, that Wallace did not "count" for assignments at elevation because she was a woman with "t*** and an a**."  Casey denied saying that directly to Wallace but acknowledged that he "very easily could have said [that]," in general, "due to t*** and an a**, no female is allowed on the rack."

On other occasions, Wallace witnessed conversations between Terro and Tapley in which they discussed the fact that their project manager, A.C. Ferachi, did not want women working on this particular project.  Wallace claims that she complained to Gautreau and Terro several times about Casey preventing her from working at elevation.  Still, only male helpers (and one male laborer) were allowed to work at elevation.  On one occasion, Performance was short on helpers at elevation, so Wallace was allowed to work at elevation for three days.  But according to Wallace, Performance's management saw Wallace up there and told Terro not to let her up at elevation again.

Comments about Wallace were not limited to her ability to work at elevation.  Casey, who allegedly made the "t*** and an a**" comment regularly, also said (in Wallace's vicinity) that he needed "a bucket of b***jobs."  He later noted that this type of behavior was common "in a construction setting" where "you are not always looking over your shoulder to see who you are going to offend."  Wallace alleges that she complained to Terro and Gautreau about Casey's behavior several times.

Terro, while both he and Wallace were at work, allegedly texted Wallace a picture of his genitals and asked her to send back a picture of her breasts.  Though Wallace immediately deleted the picture, she was around another female employee at the time, and Wallace told her about the picture

No. 21-30482

(though Wallace did not identify Terro as the sender). Wallace says she was "upset," "distraught," and "in shock," and that her fellow employee was also shocked. Wallace says that Terro later addressed the picture in question and did not deny sending it but instead said that it took "guts to send that" picture to her. On several other occasions, Wallace alleges that Terro asked to "grab and squeeze" her breasts. Wallace says she was too shocked to report all this to HR, but she did tell Tapley (her husband) who called and left messages with HR that were never returned.

Charles Laprairie was one of Performance's welders. The same month that Terro allegedly sent the picture to Wallace, Laprairie allegedly approached Wallace from behind and asked her how old she was. When she responded, Laprairie allegedly replied that at that age, Wallace was in her "sexual prime." When Wallace walked away and sat down, Laprairie again approached her from behind and began grabbing and massaging her shoulders. Justin Quebodeaux, another general foreman, witnessed the interaction along with other employees. Wallace immediately reported Laprairie to Tapley, who then spoke to Quebodeaux and Casey about the incident, and Terro and Gautreau learned of and spoke about the incident with Wallace. Though they spoke with Laprairie and allegedly vowed to reprimand him, Laprairie allegedly quit "to make more money" at another job before any action was taken.[1]

All of these experiences, according to Wallace, caused her severe anxiety and depression. This led her to seek medical assistance. When

---

[1] Wallace experienced other untoward conduct by her co-workers while at Performance. Quebodeaux and other male employees once allegedly pulled down their pants in front of Wallace and others on the jobsite, and though Gautreau was present, he never disciplined any of them. In addition, Ferachi, the project manager, once asked Tapley (Wallace's husband) whether he had seen a particular female employee's "chest" and that he "ought to [because] they are nice."

No. 21-30482

Wallace missed work to go to a doctor's appointment to treat her anxiety and depression, Performance suspended her.  Wallace claims that she notified Performance that she had a doctor's appointment.  Performance claims the suspension was based on Wallace's poor attendance and tardiness. According to Wallace, Performance had a three-strikes policy for tardiness or absences, and even though she had not been previously reprimanded for any absences, Performance assessed all three strikes at once and suspended her.

Wallace says she tried to call HR about her suspension, but was only able to leave a message, and no one ever called her back.  When she visited HR in person, Wallace says no one was available to help her.  Tapley also found out he was going to be fired for his absences, and he *was* able to speak with HR and had his termination reversed.[2]  Wallace later sent in a letter of resignation, which Performance says it never received.  A few weeks later, Performance formally terminated Wallace's employment.

Wallace filed a charge with the EEOC, received her right-to-sue notice, then sued Performance under Title VII.  She brought three claims: (1) sex discrimination; (2) sexual harassment; and (3) retaliation.  After discovery, Performance moved for summary judgment on all claims, which the district court granted.

As for Wallace's sex-discrimination claim, the district court held that Wallace did not face an adverse employment action.  Specifically, the court held that Performance's restricting Wallace from working at elevation was

---

[2] In that conversation, Performance HR allegedly told Tapley that if an employee has not had previous reprimands or write-ups, the worst discipline warranted by a missed day of work is a verbal, written, and three-day suspension, but no termination.

not an "ultimate employment decision" which Title VII requires under binding Fifth Circuit precedent.

On the sexual-harassment claim, the district court held that Wallace *did* face severe or pervasive harassment. But the district court ultimately concluded that Wallace could not establish a nexus between that harassment and a "tangible employment action" by Performance. The district court further held that even if she could establish a nexus, Performance had established the *Ellerth/Faragher* affirmative defense,[3] meaning that Performance showed both: (1) that it exercised reasonable care to prevent and promptly correct any sexual harassment; and (2) that Wallace unreasonably failed to take advantage of the appropriate HR procedures for dealing with sexual harassment.

Finally, on her retaliation claim, the district court held that Wallace had not sufficiently "opposed" any unlawful action under Title VII, and as to Laprairie's conduct, that Wallace could not have "reasonably believed" his conduct ("sexual prime" comment and massaging of her) was actionable under Title VII. Wallace timely appealed.

## II.

We review the grant of summary judgment *de novo*. *Lewis v. Sec'y of Pub. Safety & Corr.*, 870 F.3d 365, 368 (5th Cir. 2017). Summary judgment is proper if the movant shows that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. *Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020) (citing Fed. R. Civ. P. 56(a)). A fact is "material" if resolving it one way or another might make one outcome of the lawsuit more or less likely; it need not be dispositive.

---

[3] *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

*Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).  A genuine dispute over that fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357–58 (5th Cir. 2017) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)).  We view the evidence in the light most favorable to the non-movant and resolve factual controversies in the nonmovant's favor.  *Id.* (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)).

Wallace argues that the district court erred in granting summary judgment to Performance on all her claims.  First, she argues that when Performance prevented her from working at elevation because she was a woman, it effectively demoted her, which amounts to an adverse employment action.  Second, Wallace argues that her hostile-work-environment claim survives summary judgment because Performance knew (or should have known) about the severe or pervasive harassment, and because Performance is not entitled to the *Ellerth/Faragher* affirmative defense.  Third, she argues that a reasonable jury could find that Performance retaliated against her for opposing conduct that she reasonably believed would violate Title VII.  We agree with her on each claim.

## A.

Title VII forbids an employer from taking an adverse employment action against an employee because of her sex.  *See* 42 U.S.C. § 2000e-2(a); *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (noting that "adverse employment action" is "a judicially[ ]coined term referring to an employment decision that affects the terms and conditions of employment").  Wallace can establish a sex-discrimination claim by either direct or circumstantial evidence.  *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 475 (5th Cir. 2015).  If she has direct evidence of

7

No. 21-30482

discrimination, the court does not wade into the *McDonnell Douglas* test,[4] but instead the burden shifts to Performance to "prove by a preponderance of the evidence that the same decision would have been made regardless of the discriminatory animus." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005). In any event, to have a sex-discrimination claim at all, Performance must have taken adverse employment action against Wallace. Adverse employment actions under Title VII include "ultimate employment decisions" such as "hiring, firing, demoting, promoting, granting leave, and compensating." *Thompson*, 764 F.3d at 503.[5]

The district court held that Performance did not take adverse employment action against Wallace in either (1) preventing Wallace from developing construction skills by working at elevation, or (2) failing to train Wallace to work at elevation. Specifically, the district court noted that Wallace cited "only her own testimony" to show that "the way to advance at Performance was to learn and practice new skills," relying on "common knowledge," without providing evidence "relating to specific comparators who advanced as a result of their wider range of skills or desired promotions."

---

[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

[5] We are bound by our circuit's precedent requiring an "adverse employment action" that includes *only* "ultimate employment decisions." *Thompson*, 764 F.3d at 503. We recognize that 42 U.S.C. § 20002-2(a)(1) prohibits sex discrimination "with respect to" an individual's "compensation, terms, conditions, or privileges of employment," and that "our liquidation" of those terms has left a gap between what Title VII says and what we require. *Threat v. City of Cleveland*, 6 F.4th 672, 678 (6th Cir. 2021) (Sutton, J.); *see Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) (*en banc*) (overruling prior precedent, which required an "objectively tangible harm," because it was a "judicial gloss that lacks any textual support" in Title VII). A panel of our court recently acknowledged as much. *See Hamilton v. Dallas Cnty*, 42 F.4th 550, 557 (5th Cir. 2022) (panel opinion vacated, petition for rehearing en banc granted in *Hamilton v. Dallas Cnty.*, 50 F.4th 1216 (5th Cir. 2022)). As discussed in the text infra, we need not reach that issue here because we conclude that Wallace was effectively demoted when she was prohibited from working at elevation because of her sex.

Responding to Wallace's argument that keeping her on the ground was a "de facto demotion," the district court noted that her written job description "includes the cleaning tasks that Wallace complains of being asked to perform" and, in the "absence of more concrete evidence, such as a reduction in pay or the denial of a promotion, Wallace's testimony [was] insufficient to establish that she suffered any adverse employment action."

Though a "demotion" is considered an "ultimate" employment action under Title VII, "a change in or loss of job responsibilities" may still amount to "the equivalent of a demotion" if it is "so significant and material that it rises to the level of an adverse employment action." *Thompson*, 764 F.3d at 504. To be "equivalent to a demotion," the action need not "result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 612 (5th Cir. 2007).

*Thompson* is but one example. There, we held that an employer effectively demoted a detective when it "restricted his job description to such an extent that he no longer occupie[d] the position of a detective," but instead he ultimately "function[ed] as an assistant to other detectives." 764 F.3d at 505. And in *Alvarado*, we concluded that denying a woman a transfer from being a state trooper to becoming a Texas Ranger, allegedly based on sex, was equivalent to the denial of a promotion. 492 F.3d at 614–15. That was because, despite the pay-scale being the same, becoming a Texas Ranger was considered objectively better in that line of work. *Id.* at 615.

A reasonable juror could conclude that Wallace's being prevented from working at elevation effectively demoted her back to the laborer role she previously occupied. Wallace produced evidence to show that, to advance in this industry, she needed the experience of working at elevation, which

provides the most hands-on experience she could attain in this role. Working at elevation was the most beneficial and important aspect of the helper position. Working only on the ground made Wallace less "useful" and a less-valuable "asset" than if she worked at elevation. And it made it less likely that Wallace would be able to be promoted and advance in her career down the line. Even though Wallace's pay was no different while working on the ground, the opportunities she was afforded while working on the ground were significantly less than if she were working at elevation. *See Thompson*, 764 F.3d at 504. Thus, a reasonable juror could find that these facts support the conclusion that Wallace was effectively demoted because she was a woman.[6]

Performance's protestations to the contrary are based on material factual disputes that cannot be resolved at the summary-judgment stage. Performance claims, for example, that Wallace was inexperienced with working at elevation, even though Wallace claims she *did* have experience. Also relevant is the fact that, according to Performance, Wallace and Gautreau apparently had an agreement for her to work on the ground until "dance floors" (an addition to the scaffolding to make it longer and wider to work on) were placed "in the racks." But in the very next breath, Performance acknowledges that Wallace *did* work at elevation briefly *before* dance floors were installed, and as Wallace notes, she did not work at elevation even *after* dance floors were installed. All told, viewing the facts in the light most favorable to Wallace, a reasonable juror could find that

---

[6] A reasonable juror could also find that Performance failed to train her because she was a woman. As noted in the facts above, working at elevation provides the greatest possible opportunities for advancement in this industry. If Performance was preventing her from receiving this hands-on experience, a reasonable juror could consider this evidence more than "tangential evidence of a potential effect on compensation," *Brooks v. Firestone Polymers, LLC*, 640 F. App'x 393, 397 (5th Cir. 2016), and instead could conclude that it amounts to a failure to train.

No. 21-30482

Performance took adverse employment action against her by preventing her from working at elevation because she was a woman.

The next question is whether Performance discriminated against Wallace because of her sex. The district court did not address whether Performance discriminated against Wallace because of her sex and instead focused only on whether Performance took adverse employment action against her. In the district court, Performance did not address whether the evidence of discrimination was direct or circumstantial, but instead argued that: (1) Performance did not take adverse employment action against Wallace; and (2) Wallace failed to "show that she was treated less favorably than similarly situated male employees under nearly identical circumstances."

The latter argument, though, is only relevant when circumstantial evidence is necessary to establish a sex-discrimination claim under the *McDonnell Douglas* framework. *Hester v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185–85 (5th Cir. 2018); *see Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009), which applied the *McDonnell Douglas* framework). But when the employee "presents credible direct evidence that discriminatory animus at least in part motivated, or was a substantial factor in the adverse employment action," the burden shifts to the employer "to prove by a preponderance of the evidence that the same decision would have been made regardless of the discriminatory animus." *Jones*, 427 F.3d at 992. We conclude that Wallace has presented direct evidence of discrimination.

Direct evidence is that which "proves the fact without inference or presumption." *Id.* at 992. This evidence includes "any statement or written document showing a discriminatory motive on its face." *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 329 (5th Cir. 1994). In *Portis*, we held that a supervisor's statements that women were not "worth as much as" men and

that an employee "would be paid less because she was a woman" were direct evidence of discrimination. *Id.* at 326. In *Etienne*, we held that direct evidence established race discrimination when the employee presented an affidavit stating that her supervisor did not allow "dark skin black persons to handle any money," and that the employee "was too black to do various tasks." 778 F.3d at 476–77.

Wallace's evidence provides a facially discriminatory motive "without inference or presumption." *Portis*, 34 F.3d at 329. Specifically, Wallace's supervisor stated repeatedly that she could not work at elevation because she had "t*** and an a**," and that "females stay on the ground." Thus, at the summary-judgment stage, Wallace has shown that Performance's reason for preventing her from working at elevation was motivated primarily by her being a woman. Because there is direct evidence of discrimination, Performance is wrong that the burden is on Wallace to show that she was treated less favorably than similarly situated male employees under nearly identical circumstances. Rather, the burden is on Performance "to prove by a preponderance of the evidence that the same decision would have been made regardless of the discriminatory animus." *Jones*, 427 F.3d at 992. Performance argues that she was not qualified or had inadequate experience to work at elevation, but Performance hired her at the helper position (which includes working at elevation as part of the job duties) and even allowed her to (briefly) work at elevation.

Performance was not entitled to summary judgment because reasonable jurors could find that Wallace was kept on the ground because she was a woman, and that she otherwise would have been allowed to work at elevation. Accordingly, we reverse the grant of summary judgment on the sex-discrimination claim.

B.

Title VII also prohibits sexual harassment as a form of employment discrimination. *EEOC v. Boh Bros. Const. Co., LLC*, 731 F.3d 444, 453 (5th Cir. 2013) (*en banc*) ("There are two types of sexual harassment under Title VII: *quid-pro-quo* and hostile-environment harassment."). For a *quid-pro-quo* claim, an employee must show "that the acceptance or rejection of a supervisor's alleged sexual harassment resulted in a 'tangible employment action.'" *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 772 (5th Cir. 2009). A "tangible employment action" is one that amounts to a "significant change in employment status," like "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (quotation omitted). When a supervisor is the harasser, the employer is "vicariously liable *per se*" if there is a "nexus" between the harassment and the tangible employment action. *Casiano v. AT&T Corp.*, 213 F.3d 278, 283–84 (5th Cir. 2000).

For hostile-work-environment claims, an employee must show that: "(1) she belongs to a protected class; (2) she was subjected to harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action." *Saketkoo v. Admins. of Tulane Educ. Fund*, 31 F.4th 990, 1003 (5th Cir. 2022). When a supervisor is the harasser, the employee need not establish the fifth element. *Boh Bros.*, 731 F.3d at 453. Of those *prima facie* elements, the only contested issue is whether the harassment was "severe or pervasive enough" to "affect[] a term, condition, or privilege" of Wallace's employment. *See Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399–400 (5th Cir. 2021).

The district court first held that Wallace *did* experience severe harassment. But then it held that: (1) Wallace did not establish a sufficient

nexus between the harassment and any "tangible employment action," thus foreclosing her *quid-pro-quo* claim; and (2) Performance was entitled to the *Ellerth/Faragher* affirmative defense, foreclosing her hostile-work-environment claim. We agree with the district court that Wallace experienced severe harassment, but we disagree, as set forth below, with the remainder of the district court's holding.

1.

We start with the tangible employment action. For *quid-pro-quo* claims, "proof that a tangible employment action did result from the employee's acceptance or rejection of sexual harassment by [her] supervisor make the employer vicariously liable, *ipso facto*; no affirmative defense will be heard." *Casiano*, 213 F.3d at 284. As discussed earlier, Wallace was effectively demoted when she was prevented from working at elevation, and "a demotion" is considered a tangible employment action. *See Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 162 (5th Cir. 2007) (citing *Faragher*, 524 U.S. at 786). But there is less of a nexus between the significant reduction of material responsibilities and the harassment by Wallace's supervisors, Terro and Casey—the demotion happened once she joined Performance as a helper, not in response to her acceptance or rejection of the supervisors' harassment. In other words, a reasonable jury could not find that there is a sufficient nexus between Wallace's demotion and her response to the harassment.

Wallace's suspension and termination, however, are both tangible employment actions. *Ellerth*, 524 U.S. at 761. Wallace experienced extensive harassment from Terro. He sent her a picture of his genitals; he specifically requested that Wallace send him a picture of her breasts; he later remarked that it "took guts" for him to send the picture to her; and throughout this time, he repeatedly asked to grab her breasts. A month later, Terro signed

Wallace's suspension notice, claiming it was because of her absences. But a reasonable jury could infer that this decision was made because of Wallace's "rejection" of Terro's "sexual harassment." *See Casiano*, 213 F.3d at 283. Even though the district court credited Gautreau's testimony that he directed Terro to fire Wallace, only Terro's signature appears on the suspension notice. In addition, Casey (another supervisor who arguably harassed Wallace) testified that he could have been involved in the decision to discipline Wallace. There is at least a material factual dispute about whether Terro fired Wallace (which he had the power to do) or Gautreau, and what role Casey played in the situation. *See Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 616 (5th Cir. 2020) (stating that the court must view "all the facts and evidence in the light most favorable to the non-movant").

Thus, a reasonable jury could find that Terro suspended and later fired Wallace because of her rejection of his harassment. Therefore, we reverse the district court's dismissal of Wallace's *quid-pro-quo* sexual harassment claim.

2.

Even assuming *arguendo* that there was no tangible employment action for this claim, Wallace can survive summary judgment if a reasonable jury could find that her supervisors' conduct toward her was "severe or pervasive sexual harassment." *Casiano*, 213 F.3d at 284. The district court held that, at the summary-judgment stage, "there is enough [evidence] to possibly persuade a jury that the total amount of harassment alleged could have affected a term or condition of her employment." But it held that Performance had sufficiently established the affirmative defense detailed by the Supreme Court in *Ellerth* and *Faragher*. *See Casiano*, 213 F.3d at 284 (citing *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 805, 807).

15

We agree with the district court that a reasonable jury could find that this harassment was severe or pervasive. A hostile work environment exists when a workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Johnson*, 7 F.4th at 399 (quotation omitted). Harassment is "severe or pervasive enough" when (1) a reasonable person in the plaintiff's position would find it hostile or abusive, and (2) the plaintiff subjectively perceived the harassment as abusive. *Id.* at 400. The objective element is determined based on all the facts and considers factors (each independently non-dispositive) such as: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

The district court summed up the key facts leading to its severe-or-pervasive conclusion: (1) Terro's sending a picture of his genitalia, asking for a picture of her breasts, and asking to touch her breasts; (2) Casey's referring to "t*** and an a**," and his statement that he could use a "bucket of b***jobs"; and (3) Laprairie's saying that Wallace was in her "sexual prime" and his nonconsensual massaging of her. Performance's response relies mostly on the fact that everyone thought the comments were a joke, or that Wallace was otherwise undisturbed by the comments. Performance also says that, with Terro's nude picture, Wallace never provided phone records or produced the picture, and that Wallace later invited Terro to her husband's birthday party.

Nonetheless, based on the totality of the evidence, a reasonable jury could find that this conduct was objectively hostile. *Johnson*, 7 F.4th at 400. Casey's comments about Wallace's "t***" and "a**" allegedly happened

No. 21-30482

at least weekly; Terro asked to grab her breasts on several occasions; Laprairie's sexual comment and massaging of her, though they only happened on one occasion, were physical and explicitly sexual. *See id.* And Wallace provided evidence that would establish that she subjectively considered the harassment hostile and abusive: she complained about the harassment, reported it to her supervisors, and suffered psychological harm as a result. Thus, the district court correctly concluded that Wallace established a *prima facie* hostile-work-environment claim.

3.

Next, we turn to the *Ellerth/Faragher* defense. "To succeed on summary judgment in reliance on an affirmative defense, the moving party must establish beyond peradventure all of the essential elements of the" "defense to warrant judgment in [its] favor." *Smith v. Ochsner Health Sys.*, 956 F.3d 681, 683 (5th Cir. 2020) (quotation omitted). Under the *Ellerth/Faragher* affirmative defense, "an employer will not be vicariously liable for harassment by a supervisor if it can show" that (1) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) the "employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Boh Bros.*, 731 F.3d at 462 (quotation omitted). Because Performance failed to carry its burden on the first prong, we need not address the second.

The district court held that Performance satisfied the first prong because it "had in place anti-harassment/discrimination policies and practices, which were communicated to Wallace at hiring." It further stated that "[u]nder these policies, sexual harassment is expressly forbidden and employees are directed to report any instance to Human Resources." While such a policy is evidence that Performance took some measures to prevent

harassment and discrimination, *Harvill v. Westward Comms., L.L.C.*, 433 F.3d 428, 432–39 (5th Cir. 2005), "[n]ot every policy eliminates liability," *Boh Bros.*, 731 F.3d at 463.

Here, Wallace testified that she tried several times to contact HR to no avail. As is discussed above, Wallace was also repeatedly subject to harassment by Terro and Casey. Terro purportedly sent a text message picture of his genitals to Wallace, and she informed another female employee about this. Terro further allegedly asked to inappropriately touch Wallace on several occasions, and, after Wallace told Tapley about this, he attempted to contact HR but never received a response to his outreach. In addition, Casey repeatedly made a variety of pejorative comments to Wallace in front of other employees. Wallace argues that Performance's HR policy notes that *anyone* who witnesses sexual harassment should report it to HR, and the fact that no one ever did implies that employees did not know about or understand the nature of sexual harassment. *See Pullen v. Caddo Par. Sch. Bd.*, 830 F.3d 205, 213 (5th Cir. 2016) (holding that the first *Ellerth/Faragher* element was not satisfied as a matter of law when evidence indicated that employees "were given no training or information about the sexual-harassment policy"). This, along with her supervisors' pervasive harassment despite the anti-harassment policy, further casts doubt on the district court's conclusion on this prong. Simply put, this evidence indicates that Performance had a policy in theory but not one in practice.

On this record, there is a material fact issue about whether Performance effectively implemented its anti-harassment policy. *See Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 482–84 (5th Cir. 2008). And in any event, a reasonable jury could conclude, based on Wallace's testimony, that Performance's HR policy was not implemented. That alone is enough to reverse on this affirmative defense. *Boh Bros.*, 731 F.3d at 466 (noting that the "two prongs of the *Ellerth/Faragher* affirmative defense are

conjunctive," so the court does not need to "consider prong two" if its determination on prong one is dispositive).

Thus, we conclude that Performance took tangible employment action against Wallace based on her rejection of Terro's (and to a lesser extent Casey's) harassment. In addition, we hold that Wallace established a *prima facie* hostile-work-environment claim and that Performance has not established its entitlement to the *Ellerth/Faragher* defense at this stage. Accordingly, we reverse the grant of summary judgment on the sexual-harassment claim as well.

## C.

Title VII also forbids retaliation as a form of sex-based discrimination. To establish a retaliation claim, the employee must show that: (1) she "participated in an activity protected by Title VII;" (2) her "employer took an adverse employment action against" her; and (3) "a causal connection exists between the protected activity and the adverse employment action." *Newbury v. City of Windcrest*, 991 F.3d 672, 678 (5th Cir. 2021) (quotation omitted). Such claims require a burden-shifting framework like the *McDonnell Douglas* test.

If the employee establishes a *prima facie* retaliation claim, "the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision." *Feist v. La., Dep't of Justice, Off. of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (quotation omitted). If the employer provides one such reason, "the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation, which the employee accomplishes by showing that the adverse action would not have occurred 'but for' the employer's retaliatory motive." *Id.* (quotation and citations omitted). To "avoid summary judgment," the employee must show "a conflict in substantial evidence" on the question "whether the employer

would not have taken the action 'but for' the protected activity." *Id.* (citation omitted).  For the *prima facie* case, the only issue is the first element: whether Wallace engaged in protected activity.  The district court concluded that Wallace did not establish that she engaged in protected activity, so it did not address whether Wallace could establish the remaining elements of her prima facie case.

1.

An employee engages in protected activity when she opposes an employment practice that she "reasonably believes" violated Title VII. *Badgerow*, 974 F.3d at 619.  As the EEOC as amicus helpfully points out, stating one's belief that discrimination has occurred "virtually always" constitutes opposition, except in "eccentric cases." *Crawford v. Metropolitan Government of Nashville & Davidson County*, 555 U.S. 271, 276-77 (2009). Wallace claims that she engaged in protected activity when she complained about (1) her supervisors' decisions to prevent her from working at elevation, (2) Terro's obscene picture and remarks, and (3) Laprairie's sexual comment and his nonconsensual massaging of her.  Puzzlingly, the district court dismissed these claims because (1) her complaints about not working at elevation were only "general gripes" and were not specifically about her being a female, and (2) Laprairie's conduct alone was not enough to give rise to a Title VII claim.

To start, the district court improperly resolved factual disputes in Performance's favor when it characterized Wallace's complaints as "general gripes."  Wallace testified that she specifically told Terro and Gautreau that Casey would not let her work at elevation "because [she] was a female." Thus, by complaining to her supervisors about not being afforded opportunities based on her sex, she engaged in protected activity in making these complaints. *Cf. Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337,

348–49 (5th Cir. 2007); *see also Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010) ("Magic words are not required" as long as the employee "alert[s] an employer to the employee's reasonable belief that unlawful discrimination is at issue."). Wallace also opposed Laprairie's conduct by complaining about it to her supervisors. The district court considered this one incident not "severe" or "pervasive enough" to amount to Title VII liability on its own. Though one sexual-harassment incident is sometimes not enough to establish a Title VII claim, sometimes it can be. *See EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 243–44 (5th Cir. 2016) (detailing such incidents).

The question is, based on the significant harassment that Wallace had endured up to this point, whether Wallace "reasonably believed" that Laprairie's comment (that she was in her "sexual prime") and his nonconsensual massaging of her were enough to establish Title VII liability. We have said that sexual remarks and intimate contact make harassment more severe, and thus even isolated incidents can amount to severe or pervasive harassment. *Cherry v. Shaw Coastal, Inc.*, 668 F.3d 182, 189 (5th Cir. 2012); *Harvill v. Westward Comms.*, 433 F.3d 428, 434 (5th Cir. 2005). We conclude that a reasonable jury could find that Laprairie's comment and nonconsensual massaging of Wallace was enough, based on the surrounding circumstances of Wallace's harassment, to be severe or pervasive enough. Thus, when Wallace complained about Laprairie's conduct, her belief was reasonable that his conduct amounted to unlawful discrimination.

As a result, both as to Casey's conduct *and* Laprairie's conduct, we conclude that Wallace's complaints were "protected activity." Therefore, we reverse the district court's summary-judgment dismissal of Wallace's retaliation claim and remand the claim for further proceedings.

* * *

No. 21-30482

Because we hold that the district court erred in granting summary judgment on all three claims, we REVERSE and REMAND for further proceedings consistent with this opinion.