United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 11, 2007**

Charles R. Fulbruge III
Clerk

REVISED September 5, 2007

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 06-30453

---

ERMA MCCOY,

Plaintiff-Appellant,

versus

CITY OF SHREVEPORT,

Defendant-Appellee.

--------------------
Appeal from the United States District Court
for the Eastern District of Louisiana
--------------------

Before HIGGINBOTHAM, WIENER, and PRADO, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Erma McCoy, a former lieutenant with the Shreveport Police Department (SPD), appeals from the district court's summary-judgment dismissal of her employment discrimination suit against the City of Shreveport (the City). We affirm.

## I. FACTS & PROCEEDINGS

Erma McCoy, a black female, worked for the SPD as a permanent police officer from December 1981 until her retirement in December 2003. McCoy attained the rank of lieutenant in February 2002. In July 2003, McCoy filed a grievance with SPD's Internal Affairs Bureau (IAB) alleging that a subordinate officer, Sergeant Ed

Jackson, who is white, harassed her by twice throwing wadded-up paper in her face and by repeatedly entering her office only to stare at her and laugh in mocking derision. As McCoy's grievance involved allegations of workplace harassment, SPD also forwarded it to the personnel department of the City for its separate review. Both the City and SPD concluded that Sergeant Jackson's conduct did not constitute harassment, and City personnel recommended that both Sergeant Jackson and McCoy be counseled about workplace "horseplay."

The following month, Captain Rick Walker, McCoy's supervisor, informed her that her harassment complaint had not been substantiated and cautioned her against future workplace horseplay. When she received this news and caution, McCoy became extremely upset and questioned the thoroughness with which the SPD and the City had investigated her complaint. Captain Walker told McCoy that she could speak to the Chief of Police if she was dissatisfied with the way the investigation had been conducted. She declined, however, then began crying uncontrollably, reportedly telling Captain Walker that she "knew it would come back this direction, this way and that's the reason why we have violence in the workplace and that if they're not going to take care of it, then I'll take care of it." McCoy denies making this statement but admits that she was in an emotional state and acknowledges telling Captain Walker that she would "not take this lying down." McCoy also remembers Captain Walker being present later when she told a

2

fellow black lieutenant, who had inquired why McCoy was so upset, that "we are not officers, we are not sergeants . . . or lieutenants," but rather "we are black officers . . . black sergeants, and black lieutenants, and . . . each time we move up, we become less." McCoy eventually asked to be relieved of duty so that she could see her doctor about the emotional distress she was experiencing.

Captain Walker consulted with two SPD lieutenants who had witnessed McCoy's reaction, and decided that, out of concern for McCoy's safety (and possibly that of others), he should retrieve her gun before she left the police station. McCoy surrendered her gun before leaving work. Captain Walker then informed SPD Assistant Chief Charlie Owens of the events surrounding McCoy's departure. Owens indicated his belief that, because Captain Walker had taken McCoy's gun, he effectively had placed her on administrative (or "departmental") leave. Owens instructed Captain Walker to have McCoy sign the paperwork necessary to process an administrative leave. The next morning, Captain Walker went to McCoy's home, had her fill out the necessary forms, and retrieved her badge.

At some time during the next month, IAB reclassified McCoy's leave as extended sick leave. Captain Walker was informed that his (and Assistant Chief Owens's) designation of McCoy's leave as administrative leave was a mistake. McCoy was paid her full salary throughout her leave.

In December 2003, McCoy informed the SPD that she had decided to retire at the end of the month. She stated that, despite her admiration for the SPD leadership and her general desire to continue serving as a police officer, her health considerations would not allow her to "go on under the circumstances." Specifically, she mentioned concerns about "constantly having to face Ed Jackson, constantly having to look behind my back, constantly having to come in and explain why I did certain things as a lieutenant doing my job."[1] At the time that McCoy submitted her retirement letter, her doctor had not yet released her to return to work, and she still had several months of paid sick leave accumulated.

McCoy filed suit in Louisiana state court in August 2004, alleging that the City had (1) discriminated against her on grounds of race and sex and had retaliated against her, both acts allegedly taken in violation of Title VII, the First Amendment, and Louisiana law, and (2) intentionally caused her emotional distress, in violation of Louisiana Civil Code article 2315. The City removed the case to the district court on federal question jurisdiction. The federal court eventually granted summary judgment in favor of the City on (1) McCoy's discrimination and retaliation claims, because, inter alia, she had suffered no adverse employment action

---

[1] Ironically, at the time McCoy informed SPD of her decision to retire, Sergeant Jackson had retired.

and the conduct of which she complained was not sufficiently severe or pervasive to constitute a hostile work environment; and (2) her Louisiana tort claim, because she could not show conduct by the SPD that met the legal standard for intentional infliction of emotional distress.  McCoy timely filed her notice of appeal.

## II.  ANALYSIS

### A.  Standard of Review

We review a grant of summary judgment <u>de novo</u>.[2]  Summary judgment is proper only when the movant can demonstrate that there is no genuine issue of material fact and that she is entitled to judgment as a matter of law.[3]

### B.  Merits

#### 1.  McCoy's Title VII Claims

##### a.  Applicable Title VII Law[4]

---

[2] <u>Willis v. Coca Cola Enters., Inc.</u>, 445 F.3d 413, 416 (5th Cir. 2006).

[3] <u>Id.</u>

[4] Louisiana's anti-discrimination statute, LA. REV. STAT. ANN.§ 23:301 et seq., is "substantively similar" to Title VII, and Louisiana courts routinely look to the federal jurisprudence for guidance. <u>Trahan v. Rally's Hamburgers Inc.</u>, 696 So. 2d 637, 641 (La. App. 1st Cir. 1997).  Consequently, the outcome of McCoy's statutory discrimination and retaliation claims will be the same under the federal and state statutes.  We therefore analyze the issues only under the applicable federal precedents.

Assuming a plaintiff has exhausted his administrative remedies,[5] he may prove a claim of intentional discrimination or retaliation either by direct or circumstantial evidence. We analyze cases built on the latter, like this one, under the framework set forth in McDonnell Douglas Corp. v. Green.[6] Under that framework, the plaintiff must first establish a prima facie case of discrimination, which requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.[7] To establish a prima facie case of retaliation, the plaintiff must establish that: (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action

---

[5] The district court ruled that, because McCoy signed her EEOC Charge Questionnaires on June 14, 2004, any of her claims that arose before August 15, 2003 (300 days earlier) were time-barred. The court therefore dismissed McCoy's claims based on Sergeant Jackson's reported paper-throwing harassment, which allegedly occurred on June 12 and June 26, 2003. Accordingly, the district court considered those incidents only as part of the totality of the circumstances relevant to McCoy's hostile work environment claim. McCoy does not challenge this ruling on appeal.

[6] 411 U.S. 792, 802 (1973).

[7] See Wheeler v. BL Dev. Corp., 415 F.3d 399, 405 (5th Cir. 2005).

6

against him; and (3) a causal connection exists between the protected activity and the adverse employment action.[8]

If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action.[9] The employer's burden is only one of production, not persuasion, and involves no credibility assessment.[10] If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose.[11] To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer.[12]

### b.    Adverse Employment Action

The district court based its summary judgment dismissal of McCoy's race and sex discrimination and retaliation claims on her inability to demonstrate that she suffered a legally actionable

---

[8] Banks v. E. Baton Rouge Parish Sch. Bd., 320 F.3d 570, 575 (5th Cir. 2003); Gee v. Principi, 289 F.3d 342, 345 (5th Cir. 2002).

[9] See Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000) (discrimination); Gee, 289 F.3d at 345 (retaliation).

[10] Russell, 235 F.3d at 222.

[11] See id.

[12] Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003).

"adverse employment action." Without proving such an action, McCoy cannot make the necessary prima facie cases of discrimination or retaliation.[13] McCoy argues on appeal that the court erroneously failed to recognize that the City took adverse employment actions both by (1) creating a hostile work environment that caused her "constructive discharge" and (2) taking her gun and badge and placing her on administrative leave.

### i. Constructive Discharge

"A constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign."[14] In determining whether an employer's actions constitute a constructive discharge, we examine the following relevant factors:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not.[15]

---

[13] See Johnson v. Louisiana, 351 F.3d 616, 621 (5th Cir. 2003)(Title VII discrimination); Fierros v. Tex. Dep't of Health, 274 F.3d 187) (5th Cir. 2001) (Title VII retaliation).

[14] Hunt v. Rapides Healthcare Sys., LLC, 277 F.3d 757, 771 (5th Cir. 2001).

[15] Id. at 771-72; see also Haley v. Alliance Compressor LLC, 391 F.3d 644, 650 (5th Cir. 2004).

This inquiry is an objective, "reasonable employee," test under which we ask "whether a reasonable person in the plaintiff's shoes would have felt compelled to resign."[16]

Even considering the summary judgment evidence here in the light most favorable to McCoy, we are satisfied that a reasonable employee in her position would not have felt compelled to resign. McCoy was not demoted, suffered no reduction in salary, and was paid in full for the entirety of her leave. She was relieved of her job responsibilities, but only at her own request, and SPD never indicated that she would not be reinstated to her previous position when cleared medically to return to work. She was not reassigned to menial or degrading work, and she never received an offer of early retirement. The only actions taken by the SPD in connection with this matter were (1) counseling McCoy against workplace horseplay and (2) retrieving her badge and gun and placing her on administrative leave. These actions, when viewed in the context of the circumstances surrounding them, were not "calculated [by SPD] to encourage [McCoy's] resignation"[17] and do not meet the established standard for a constructive discharge.[18]

---

[16] Haley, 391 F.3d at 650.

[17] See id.

[18] See Hunt, 277 F.3d at 772 (affirming the district court's grant of summary judgment on constructive discharge when the employee felt demeaned by her reassignment to the night shift upon her return from medical leave); Brown v. Bunge Corp., 207 F.3d 776, 782-83 (5th Cir. 2000) (affirming a grant of summary judgment for the employer even when employee had been demoted and

McCoy does allege that she suffered badgering and harassment by Sergeant Jackson and that SPD and the City permitted it to go unchecked. Such unremediated harassment may create a hostile work environment and cause a constructive discharge, but only if it is "severe or pervasive" and "create[s] an environment that a reasonable person would find hostile or abusive."[19] "Whether an environment is hostile or abusive depends on the totality of the circumstances, including factors such as the frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance."[20]

Sergeant Jackson's conduct, even though undoubtedly offensive to McCoy, consisted of little more than occasional boorish remarks and childish horseplay. The district court correctly held that such conduct was not sufficiently severe or pervasive to create an objectively hostile or abusive work environment.[21] Moreover, at the

_____

received a reduction in job responsibilities upon his return to work); McKethan v. Tex. Farm Bureau, 996 F.2d 734, 741 (5th Cir. 1993) (affirming summary judgment for the employer when the employee claimed he had been publicly ridiculed and admonished but failed to allege any of the other constructive discharge factors).

[19] Septimus v. Univ. of Houston, 399 F.3d 601, 611 (5th Cir. 2005).

[20] Id.

[21] See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated

time McCoy chose to retire, Sergeant Jackson had already left the SPD and posed no continuing threat to McCoy's mental well-being or work-place level of comfort. McCoy also acknowledged in her retirement letter that she respected and admired the Chief of Police and that, but for her health concerns, she would look favorably on the prospect of returning to work for the SPD. Based on the summary judgment record before us, we are convinced that McCoy retired voluntarily, not as the result of a constructive discharge. As no reasonable employee in McCoy's position would have felt compelled to resign, she was not constructively discharged.

### ii. Administrative Leave

McCoy also contends that the SPD took an adverse employment action against her when Captain Walker retrieved her gun and badge and placed her on administrative leave. We have historically held that, for all Title VII claims, "[a]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating."[22] Under this standard, the district court properly held that placing McCoy on paid leave — whether administrative or sick — was not an adverse

incidents, (unless extremely serious) will not amount to discriminatory charges.") (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998)); see also Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 328 (5th Cir. 2004).

[22] Green v. Adm'rs of Tulane Educ. Fund, 284 F.3d 642, 657 (5th Cir. 2002).

employment action.[23]  In the recent case of <u>Burlington Northern &</u>

<u>Santa Fe Railway Co. v. White</u>,[24] however, the Supreme Court

abrogated our approach in the <u>retaliation</u> context in favor of the

standard used in the Seventh and D.C. Circuits, which defines an

adverse employment action as any action that "might well have

dissuaded a reasonable worker from making or supporting a charge of

discrimination."  We must therefore analyze the effect of

<u>Burlington Northern</u> on this case.

### (1)  McCoy's Discrimination Claims

In <u>Burlington Northern</u>, the Court expressly limited its

holding to Title VII <u>retaliation</u> claims:

> The underscored words in the substantive [anti-discrimination] provision — "hire," "discharge," "compensation, terms, conditions, or privileges of employment," "employment opportunities," and "status as an employee" — <u>explicitly limit the scope of that provision to actions that affect employment or alter the conditions of the workplace</u>.  <u>No such limiting words appear in the anti-retaliation provision</u>.  Given these linguistic differences, the question here is not whether identical or similar words should be read in pari materia to mean the same thing.  Rather, the question is whether Congress intended its different words to make a legal difference.  We normally presume that, where words differ as they differ here, "'Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"
>
> There is strong reason to believe that Congress intended the differences that its language suggests, for the two provisions differ not only in language but in purpose as well.  The anti-discrimination provision seeks

---

[23] <u>Breaux v. City of Garland</u>, 205 F.3d 150 (5th Cir. 2000) (holding that police officer placed on paid administrative leave did not suffer an adverse employment action).

[24] 126 S. Ct. 2405 (2006).

12

a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status. The anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. The substantive provision seeks to prevent injury to individuals based on who they are, i.e., their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct.
. . . .
Thus, purpose reinforces what language already indicates, namely, that the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.[25]

Even though our precedent recognizing only "ultimate employment decisions" as actionable adverse employment actions remains controlling for Title VII discrimination claims and therefore continues to justify summary judgment dismissal of McCoy's discrimination claims,[26] her retaliation claims requires a closer look post-Burlington Northern.

### (2) McCoy's Retaliation Claims

McCoy contends that, by retrieving her gun and badge and placing her on administrative leave, SPD took actions that might well dissuade a reasonable officer from filing a charge of discrimination. McCoy characterizes those actions as the

---

[25] Id. at 2411-13 (emphasis added) (internal citations omitted).

[26] Accord Dendinger v. Ohio, 207 F. App'x 521, 527 n.6 (6th Cir. 2006) (unpublished opinion) (noting that Burlington Northern's broadening of the definition of "adverse employment action" affects only retaliation claims).

13

functional equivalent of a discharge, because they remove "the essence of being a Police Officer." The City, on the other hand, contends that SPD's actions, <u>when viewed in context</u>, do not meet the standard set forth in <u>Burlington Northern</u>. Specifically, the City points out that McCoy (1) voluntarily requested leave, (2) made troubling statements that raised legitimate safety concerns, and (3) was paid throughout her leave. As such, insists the City, actions like SPD's should not dissuade a reasonable police officer in McCoy's situation from making a discrimination complaint.

In <u>Burlington Northern</u>, the Court recognized that arguably adverse employment actions must be viewed in context.[27] In this case, the record makes clear that McCoy did ask to leave work to see her doctor and — presumably acting on her doctor's advice — never attempted to return to work. There is no evidence that SPD would have placed her on administrative leave had she been able to continue working, or that SPD would have refused to reinstate her had she sought to return to work after her leave. The record also makes clear, however, that McCoy did not volunteer to surrender her gun and badge and did not designate her own leave as administrative: SPD made those decisions and took those actions on its own. As McCoy contends that those actions (and not her leave generally) constitute the adverse employment action in this case,

---

[27] <u>Id.</u> at 2415 ("[T]he significance of any given act of retaliation will often depend on the particular circumstances.").

14

we do not regard her initial voluntary request for leave as foreclosing her retaliation claim.

We are satisfied that McCoy's troubling statements have no bearing on whether SPD's actions constitute an adverse employment action. In the next step of the McDonnell Douglass burden-shifting framework, such statements could affect our assessment of SPD's motive for its actions, but they are irrelevant to our consideration whether McCoy's being placed on administrative leave meets the Burlington Northern standard for an adverse employment action.

Similarly, the mere fact that McCoy was placed on paid administrative leave does not necessarily mean that she did not suffer an adverse employment action. Police officers are typically placed on administrative leave, frequently with pay, when they are under investigation or as discipline for wrongdoing. In such cases, the officers are indefinitely relieved of all duties and have little, if any, control over their reinstatement. Consequently, placement on administrative leave may carry with it both the stigma of the suspicion of wrongdoing and possibly significant emotional distress. Instances of administrative leave can also negatively affect an officer's chances for future advancement.

Accordingly, we recognize that it is at least a close question whether SPD's placing McCoy on paid administrative leave constituted an adverse employment action under the Burlington

15

Northern standard.  We need not answer this question today, however, because even if McCoy could make the necessary prima facie case of discriminatory retaliation under Title VII, she cannot prove that the City's proffered legitimate, non-retaliatory reasons for collecting her gun and badge and placing her on administrative leave are pretextual.[28]

### c.  Pretext

---

[28] The City also challenges whether McCoy has established the other two elements of her prima facie case of retaliation. First, the City contends that McCoy's complaint against Sergeant Jackson did not allege race or sex as a motive for his harassing conduct, and therefore does not constitute "protected activity" under Title VII.  Next, the City conclusionally asserts that McCoy failed to establish a causal link between her protected activity and her adverse employment action.

Although we need not address these issues to resolve her appeal, we note that McCoy asserts that she was placed on administrative leave not only in retaliation for her official complaint against Sergeant Jackson, but also because she orally complained about the SPD's general mistreatment of black officers after learning that her official complaint had been denied. McCoy's complaints likely amount to protected activity.  See Grimes v. Tex. Dept. of Mental Health and Mental Retardation, 102 F.3d 137, 140 (5th Cir. 1996) ("An employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII.")(citations omitted)).

Regarding any causal connection between McCoy's complaints and her placement on administrative leave, she has at least demonstrated that the employment decisionmakers (Captain Walker and Assistant Chief Owens) knew of her complaints and took the alleged adverse employment action against her in close temporal proximity to her making those complaints. See  Swanson v. Gen. Servs. Admin., 110 F.3d 1180, 1188 (5th Cir. 1997) (holding that close timing between protected activity and adverse employment action may be sufficient to establish a "causal connection").

16

The adverse employment action allegedly taken against McCoy involved three separate acts. First, Captain Walker retrieved McCoy's gun before allowing her to leave work. Next, Assistant Chief Owens instructed Captain Walker to designate McCoy's leave as administrative, and Walker did so. Finally, Captain Walker took McCoy's badge. The City contends that Captain Walker took McCoy's gun because her comments about "workplace violence" and "taking care of the problem herself" raised legitimate concerns about her safety and that of others. The City further maintains that, because McCoy presented no evidence of any racially insensitive conduct by Captain Walker or Assistant Chief Owens, she has not raised a material fact issue whether the decision to classify her leave as administrative had a retaliatory motive vis a vis her allegations of racism in the SPD. The City does not proffer a motive for confiscating McCoy's badge other than that such action was necessary to satisfy SPD rules regarding administrative leave.

McCoy contends that she has offered sufficient evidence that the reasons given by the City for SPD's actions are mere pretext for racially retaliatory animus against her railings about the treatments of blacks in the SPD. She primarily points to her testimony that Captain Walker was standing nearby when she complained to another officer about the SPD's mistreatment of its black officers. She also notes that Captain Walker informed Assistant Chief Owens of McCoy's comments when the two men spoke later that day. And, insists McCoy, even if Captain Walker

17

legitimately confiscated her gun for safety reasons, such reasons do not justify his taking her badge.

Essentially, McCoy contends that, because Captain Walker and Assistant Chief Owens (1) were aware of her complaints about SPD's treatment of black officers, and (2) took her gun and badge and placed her on administrative leave shortly after she made those complaints, a material fact issue exists as to whether the City's proffered legitimate reasons for SPD's actions are pretextual. We disagree.

"Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a <u>prima</u> <u>facie</u> case of retaliation."[29] "However, once the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive."[30] McCoy has offered no such evidence. She had not alleged that either Captain Walker or Assistant Chief Owens ever engaged in any racially discriminatory conduct towards McCoy or any other black employee; neither does she present any evidence indicating that, under similar circumstances, white officers were treated differently than was she.

_____

[29] <u>Swanson v. Gen. Servs. Admin.</u>, 110 F.3d 1180, 1188 (5th Cir. 1997).

[30] <u>Id.</u>

18

McCoy's attempt to prove pretext simply by showing that the SPD decisionmakers knew of her complaints and took an adverse employment action shortly thereafter fails. She offers no evidence from which a reasonable juror could infer that the legitimate reasons proffered by the City for confiscating her badge and gun and placing her on administrative leave were pretextual. Consequently, summary judgment dismissal of her Title VII retaliation claims was proper.

### 2. First Amendment Retaliation

It is well settled that a plaintiff asserting a First Amendment retaliation claim in employment must show that (1) an adverse employment action was taken, (2) speech involving a matter of public concern was uttered, (3) the employee's interest in speaking outweighs the employer's interest in efficiency, and (4) the protected speech precipitated the adverse employment action.[31] The City insists that McCoy cannot show that (1) she suffered an adverse employment action, or (2) her speech involved a matter of public concern. McCoy insists that both her official complaint against Sergeant Jackson and her oral complaint about the plight of black officers in the SPD involve matters of public concern, and that the SPD's actions constitute an adverse employment action under Burlington Northern. As with McCoy's Title VII retaliation claim, however, we need not resolve these questions: McCoy has not

---

[31] Teague v. City of Flower Mound, Tex., 179 F.3d 377, 380 (5th Cir. 1999) (First Amendment retaliation).

19

presented sufficient evidence to allow a reasonable juror to conclude that her speech precipitated any adverse employment action against her.

The City's proffered legitimate reasons for the employment action taken by the SPD are discussed in detail above, as is McCoy's failure to provide any evidence that those reasons were pretext for discriminatory retaliation for her statements about SPD's mistreatment of black officers. This evidentiary shortcoming does not produce a different result simply because this claim is grounded in the First Amendment's, and not Title VII's, protection of her speech. Other than her own self-serving conclusions and the temporal proximity of the SPD's actions to her speech, McCoy has failed to produce any evidence that would support a conclusion of retaliatory animus. Given the legitimate reasons for SPD's actions proffered by the City, McCoy's evidentiary failure is fatal to her First Amendment retaliation claim.

### 3. Intentional Infliction of Emotional Distress

A Louisiana claim for intentional infliction of emotional distress is actionable only if the plaintiff can show "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or

substantially certain to result from his conduct."[32]  The conduct complained of must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."[33]  None of the conduct McCoy complains of —— whether by Sergeant Jackson or others in the SPD —— rises to that level. The district court properly granted summary judgment for the City on McCoy's Louisiana-law tort claim for intentional infliction of emotional distress.[34]

## III.  CONCLUSION

For the foregoing reasons, the district court's summary judgment dismissing each of McCoy's claims is, in all respects AFFIRMED.

---

[32] White v. Monsanto, 585 So. 2d 1205, 1209 (La. 1991).

[33] Id.

[34] To the extent that McCoy argues that her tort claim was not limited to intentional infliction of emotional distress, Louisiana Civil Code article 2315 does not protect against employment discrimination, which is the basis of McCoy's complaint. See Baynard v. Guardian Life Ins. Co., 399 So. 2d 1200, 1202 (La. App. 1st Cir. 1981).