# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 25, 2023

Lyle W. Cayce
Clerk

—————————

No. 22-50502

—————————

Frances Arredondo; Sage Coleman,

*Plaintiffs—Appellants*,

*versus*

Elwood Staffing Services, Incorporated,

*Defendant—Appellee*.

————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:20-CV-200

————————————————————

Before Jones, Clement, and Haynes, *Circuit Judges*.

Edith B. Clement, *Circuit Judge*:

Frances Arredondo and Sage Coleman[1] are two women Elwood Staffing Services, Inc. placed at a job site working for Schlumberger, Ltd. A senior coworker at their site was a lesbian who sexually assaulted Arredondo and harassed Coleman. Coleman submitted a complaint about sexual harassment, and Schlumberger terminated her. Arredondo later resigned. Together, the women filed suit in federal court alleging violations of Title

---

[1] Coleman married after she initiated this lawsuit and changed her last name to Scott. We use her maiden name for clarity.

No. 22-50502

VII. The district court entered a mixed summary judgment order, finding the women had viable claims against Schlumberger but releasing Elwood from the suit. Schlumberger subsequently settled with Arredondo and Coleman at mediation. The women now challenge the order to the extent it granted summary judgment in Elwood's favor on appeal. We AFFIRM the district court's judgment.

# I

## A

What follows are the facts presented in the light most favorable to Coleman and Arredondo. Elwood is a staffing agency that contracted with Schlumberger to provide workers for oil field operations in the Permian Basin. Arredondo and Coleman worked for Elwood, and the staffing company placed them both with Schlumberger. Arredondo is a woman of Latin American descent. Coleman is a black woman.

Both worked in the gun shop, a facility that creates explosive charges for hydraulic fracturing.[2] Elwood placed Arredondo with Schlumberger as a gun loader and Coleman as a gun loader trainee. A woman named Maritza Carrasco, who relevantly is a lesbian, served as the gun shop's manager. Another woman, also relevantly a lesbian, Brenda Mitre, was a senior employee whom Carrasco labeled a supervisor in the gun shop.

---

[2] Hydraulic fracturing, commonly called fracking, is a method of obtaining oil used across the country. When fracking, roughnecks inject water, sand, and chemicals at high pressure into the bedrock to release oil and natural gas. The process creates improved permeability in rock formations by cracking or enlarging natural cracks in the rock, allowing the fossil fuel products to be brought to the surface. *See generally*, Water Resources Mission Area, *Hydraulic Fracturing*, U.S. Geological Surv., https://www.usgs.gov/mission-areas/water-resources/science/hydraulic-fracturing (last visited May 10, 2023).

Carrasco and Mitre are of Latin American descent, and the gun shop team was primarily comprised of Hispanic Americans. Coleman and another person were the only black people in the shop. Arredondo and Coleman attended onboarding, receiving Elwood's Associate Handbook and Schlumberger's Harassment-Free Workplace Policy. Schlumberger scheduled both women for fourteen days of work with seven days off and provided them with housing and transportation. Shortly after Coleman and Arredondo started their work, Mitre targeted both women.

**1**

We first describe Coleman's situation. After Coleman started working at Schlumberger, Mitre told Coleman that she liked strip clubs and strippers with bodies similar to Coleman's. Mitre also propositioned Coleman, stating that she would "know what to do" with a woman with Coleman's body, and Mitre asked Coleman twice if she was bisexual. Mitre also touched Coleman consistently and informed Coleman that she went to strip clubs and slept with coworkers.

Uncomfortable with Mitre's behavior, Coleman requested that Carrasco move her to the night shift on her next fourteen-day work cycle. At first, Carrasco agreed, but after she returned from her seven days off, Coleman was placed back on the day shift without explanation. Around this time, Coleman decided to submit a complaint to Schlumberger's human resources team. In her complaint, Coleman reported Mitre's sexual harassment and added that she believed Carrasco and Mitre discriminated against her and the other black employee. Coleman later elaborated in her deposition that such discrimination included the use of racial epithets. Mitre called black people "pinche mayates" and "cara de changos," both translating to severe racial slurs. Coleman also later explained that black workers were ordered to do dirtier jobs, not given training opportunities,

subject to other insults, including being told they smell, and not invited to team lunches. Schlumberger launched an investigation into Coleman's allegations.

In response to the complaint, Carrasco, Mitre, and even Arredondo, among others, provided statements to Schlumberger's HR investigator, Ali Mendha. They claimed that it was Coleman who was bigoted and that Coleman disparaged Carrasco's physique and sexuality. When all was said and done, Mendha concluded that Coleman's claims could not be verified and recommended firing her for violating Schlumberger's policies. Ultimately, Schlumberger terminated Coleman and gave Mitre a written warning for inappropriate conduct.

Coleman submitted an incident report once Elwood notified her about Schlumberger's decision. A supporting witness corroborated Coleman's description of events. Coleman requested a new work assignment with similar benefits to the Schlumberger Permian Basin placement. After some phone tag, Elwood asked Coleman to apply to roles on its website so it could place her. Coleman did not apply to another placement through Elwood.

*2*

Sadly, Arredondo's situation was even worse. Starting around the same time, Mitre began sexually harassing her, culminating with sexual assault. After working at the gun shop for a bit, Carrasco and Mitre began inviting Arredondo to lunch every day. During these lunches, Mitre would attempt to touch Arredondo's leg and hold her hand. Arredondo tried to decline the lunch invitations, but ultimately Carrasco and Mitre would pressure her into getting a meal. Lunch evolved into dinner, and at one meal, Mitre pinned Arredondo and kissed her against her will. Mitre threatened Arredondo's position with Schlumberger if she reported the incident or their

"sentimental relationship," as Mitre phrased it. Arredondo only told Carrasco about Mitre's behavior.

About a week later, Arredondo finished work early but didn't have transportation back to her housing unit. Mitre offered her a ride but took Arredondo to lunch instead, over Arredondo's objections. At lunch, the two had a drink, and Arredondo excused herself to go to the bathroom. When she returned, Arredondo finished her drink, and she blacked out. When she came to, Mitre told her that she had raped Arredondo with a sex toy and taken pictures. Mitre warned Arredondo that if she told anyone about the rape, Mitre would circulate the pictures of her and threatened Arredondo's daughter. Arredondo, again, never reported this incident to Schlumberger or Elwood.

Following the rape, Mitre continued to assault and harass Arredondo sexually. At work, Mitre attempted to touch and kiss Arredondo against her will. Mitre also blackmailed Arredondo into going on dates with her by threatening to release pornographic pictures of her. On one date at an Olive Garden, Mitre fought Carrasco before attempting to kiss Arredondo forcibly. After these events, Arredondo told Carrasco that she was not in a relationship with Mitre. She also told Carrasco about the rape and subsequent blackmail. Carrasco told Arredondo that her job was safe but could lose it if she reported these incidents to HR. Instead, Carrasco recommended that Arredondo take some time off. Arredondo took two weeks off from work.

While Mitre was on vacation, she called Arredondo and told her to delete her text message history or risk losing her job. Arredondo, in a panic, complied. Around the same time, also during Arredondo's vacation, Mitre discovered that Arredondo might be pregnant and demanded that she get a

pregnancy test. Mitre told Arredondo that if she was pregnant, she would beat the unborn child out of her.

When Arredondo returned to work, things did not improve. Mitre verbally abused Arredondo, calling her a whore openly in the gun shop. Mitre also began throwing items at Arredondo. Arredondo asked if she could be sent on assignment elsewhere, but Carrasco denied her request. Arredondo then resigned from her position with Schlumberger, but the company's HR declined to hear her complaints. Instead, it simply accepted her resignation. Carrasco attempted to convince Arredondo to rescind her resignation to no avail.

Arredondo notified Elwood of her decision and the reason for it. Elwood's employee, who received Arredondo's call, expressed frustration that Schlumberger workers harassed another one of Elwood's placements. Elwood then forwarded a copy of Arredondo's sexual harassment complaint to Schlumberger. Schlumberger began an investigation with Mendha again in charge. He concluded that Arredondo and Mitre had a consensual relationship. But he also found that Mitre's behavior was inappropriate and recommended termination. Mitre never returned to Schlumberger for her termination meeting, so Schlumberger fired her for job abandonment.

**B**

Coleman and Arredondo sued Schlumberger and Elwood in federal court for violations of Title VII. Specifically, the women's complaint alleged that the companies had (1) created a hostile work environment based on sex and race; (2) intentionally discriminated against Coleman and Arredondo because of their sex; and (3) retaliated against both women for their allegations of discrimination. Specific to Elwood, Coleman and Arredondo alleged that the staffing company knew or should have known about the

harassment, discrimination, and retaliation they experienced, yet failed to act. The women also contended that Elwood conspired with Schlumberger to harass, discriminate, and retaliate against them and that Elwood failed to protect Coleman and Arredondo from such harm.

The district court delivered a mixed decision on summary judgment. First, it addressed Coleman's sex-based discrimination claims. The district court held that Coleman failed to raise a genuine dispute of material fact regarding whether the sexual harassment she experienced was pervasive or severe enough to establish a triable sexual harassment claim under Title VII. It also found that because Mitre was not a supervisor, Coleman could not sustain a triable *quid pro quo* sexual harassment cause of action. Next, regarding Coleman's discrimination based on sex claim, the district court held that she failed to demonstrate that the companies had replaced her with a man. Nor did she identify a comparator that the companies treated more favorably.

Moving on to Coleman's racial discrimination claims, the district court found that her race-based hostile work environment cause of action failed because the conduct she pointed to was not pervasive nor severe enough to justify a jury trial. The court was uncertain whether Coleman had adequately pleaded a race-based disparate treatment cause of action. Still, it decided that to the extent she had, Coleman's disparate treatment claim failed because she did not point to a non-class member who replaced her or otherwise was a comparator. However, the district court concluded that Coleman had established a triable Title VII retaliation claim. But it also found Elwood should be excused from liability under this cause of action because Coleman had not engaged in protected activity and Elwood did not take an adverse employment action.

The district court then engaged with Arredondo's causes of action. First, it held that Arredondo established a genuine dispute of material fact regarding whether Schlumberger adequately trained its personnel on its antidiscrimination workplace policies. Consequently, the district court concluded that Arredondo's hostile work environment sexual harassment claim should go to a jury. But again the court excused Elwood, determining that the staffing agency neither knew nor should have known that Arredondo was experiencing discrimination. Finally, the district court concluded that Arredondo failed to establish that she had suffered any adverse employment action and that she could not demonstrate that she was constructively discharged. So, it determined that Arredondo's disparate treatment and retaliation causes of action failed.

Faced with the facts above and the prospect of a jury trial, Schlumberger settled with Coleman and Arredondo after the district court entered its summary judgment order. The women now appeal the court's grant of summary judgment in Elwood's favor.

## II

We review a grant of summary judgment de novo. *Davidson v. Fairchild Controls Corp.*, 882 F.3d 180, 184 (5th Cir. 2018). "The court should grant summary judgment when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

Title VII claims follow the *McDonnell Douglas* burden-shifting framework. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). If Coleman and Arredondo establish *prima facie* cases in support of their various theories, the matters shift to Elwood to articulate a legitimate, non-retaliatory reason for its conduct. *Id.* at 557. If the employer meets this "burden of

production," Arredondo and Coleman must then prove that Elwood's justification is a pretext for discriminatory action. *Id.*

Elwood bears the burden of demonstrating there is no genuine dispute of material fact and it can carry that burden if it shows that Coleman or Arredondo "failed to prove an essential element of her case." *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 824 (5th Cir. 2022) (alteration adopted) (quotation marks and citation omitted). To demonstrate a genuine dispute of material fact, the women must point to "specific facts showing there is a genuine dispute for trial." *Id.* (alteration adopted) (quotation marks and citation omitted).

## III

As a preliminary matter, Elwood argues that Coleman has forfeited her claims because she did not adequately brief her Title VII retaliation and *quid pro quo* causes of action. First, regarding the retaliation claim, Elwood says that Coleman did not brief the district court on her argument that she engaged in a protected activity by submitting a discrimination report to Elwood, resulting in the staffing company retaliating against her by refusing to staff her. Second, Elwood argues that Coleman likewise failed to argue her *quid pro quo* sexual harassment claims before the district court, specifically that Mitre was Coleman's supervisor or that Mendha served as Mitre's cat's paw. Elwood says that Coleman's inadequate briefing before the district court regarding these theories should result in their forfeiture on appeal. Coleman counters that she *did* raise and brief these very arguments before the district court. We address Elwood's forfeiture arguments in turn.

## A

"A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal—or by failing

to adequately brief the argument on appeal." *Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 397 (5th Cir. 2021) (quotation marks and citation omitted). "[I]n order to preserve an argument for appeal, the argument (or issue) not only must have been presented in the district court, a litigant also must press and not merely intimate the argument during proceedings before the district court." *Templeton v. Jarmillo*, 28 F.4th 618, 622 (5th Cir. 2022) (quotation marks and citation omitted). Exceptions to this general rule include jurisdictional challenges and issues "purely legal" in nature that would "result in a miscarriage of justice" if we did not address them. *Rollins*, 8 F.4th at 398.

In her response to the motion for summary judgment, Coleman couched her argument in the framework this court laid out in *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 229 (5th Cir. 2015). In *Burton*, we found that staffing agencies can be held liable both for their own discriminatory conduct and the conduct of their clients when a staffing agency knew or should have known of its client's discriminatory behavior yet failed to take corrective actions within their control. *Id.* Following this reasoning, Coleman argued that Elwood knew that Schlumberger acted illegally when it fired her, yet Elwood failed to take measures within its control to rectify the situation by offering her comparable employment elsewhere. However, in Coleman's brief supporting her appeal, she dispenses with the *Burton* theory. Instead, Coleman argues that she directly "engaged in a protected activity when she submitted the incident report to Elwood" and that Elwood retaliated against her by not placing Coleman in comparable employment, which she deems an adverse action.

These are two distinct theories for relief under Title VII. The argument Coleman made in her response to the motion for summary judgment is based on the theory of "joint employer" liability under Title VII

(*See Burton*, 798 F.3d at 228). In contrast, the argument Coleman now presses on appeal is premised on a Title VII retaliation claim made directly against Elwood. *See, e.g.*, *Abbt v. City of Houston*, 28 F.4th 601, 610 (5th Cir. 2022). The former seeks to hold a staffing agency liable for failing to act when it knows or should have known its employees are suffering discrimination at the hands of a client. The latter aims to hold the staffing agency directly liable for its own conduct. Given the stark difference between these theories of liability, it seems that Elwood has the better of the argument and that Coleman has forfeited her direct Title VII retaliation claim against Elwood.

But not so fast. Although it did not need to do so, the district court *did* evaluate Coleman's claim against Elwood as an independent act of retaliation under Title VII. In its order, the district court held "[t]o the extent that Coleman argues she engaged in protected activity when she submitted the incident report . . . [she] does not argue or show that an adverse employment action followed."

In this circuit, "[a]lthough issues not raised before the district court are generally waived, an argument is not waived on appeal if the argument on the issue before the district court was sufficient to permit the district court to rule on it." *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 519 n.5 (5th Cir. 2010) (quotation marks and citation omitted). Here, the district court had the law and facts before it to sufficiently evaluate a Title VII retaliation claim directed at Elwood. After all, in the preceding sections of its order, the court provided the relevant facts and considered Coleman's retaliation claim against Schlumberger. The court has also provided us with sufficient reasoning so that we may effect review of its decision. *See Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 644 (5th Cir. 1992) ("a district court [must] explain its reasons for granting a motion for summary judgment in sufficient detail for us to determine whether the court correctly applied the appropriate legal test.").

No. 22-50502

So, we conclude that Coleman has not forfeited her Title VII retaliation argument, and we address its merits on appeal.

**B**

Second, Elwood challenges whether Coleman has forfeited her Title VII *quid pro quo* sexual harassment cause of action on appeal. Elwood says that in her response to the motion for summary judgment filed in the district court, Coleman failed to adequately address Elwood's argument that Mitre was not a supervisor. Therefore, her sexual harassment *quid pro quo* claim fails as a matter of law. According to Elwood, Coleman chose instead to assert her cat's paw theory of liability[3] inadequately, and it says that argument also relies on facts Arredondo, not Coleman, put forth in response to Schlumberger's affirmative defense.

In its order on the motion for summary judgment, the district court found that Coleman had not forfeited her *quid pro quo* sexual harassment claim because the complaint placed Elwood on notice that she was pursuing that theory. However, the court agreed with Elwood that Coleman could not show a material dispute of fact that Mitre was Coleman's supervisor. It then proceeded to grant summary judgment in favor of Schlumberger and Elwood regarding Coleman's *quid pro quo* sexual harassment cause of action.

On appeal, Coleman provides a litany of evidence that a reasonable jury could conclude that Mitre was Coleman's supervisor and a passing reference to her cat's paw theory. However, she fails to counter the core of

---

[3] Plaintiffs may use a "cat's paw" theory of liability when they cannot show their supervisor "harbored any retaliatory animus." *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015). To do so, they must "establish that the person with a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action." *Id*. In our context, Coleman wishes to show that Mitre used Mendha to fire Coleman. *See Id*.

Elwood's argument—that she did not raise these theories properly before the district court. Coleman does not point to where in the record she explained to the district court how Mitre used another employee as a cat's paw to fire Coleman. Looking at Coleman's response and sur-reply to the motion for summary judgment, she fails to explain how her cat's paw theory applies to her *quid pro quo* sexual harassment claim. It was incumbent on Coleman to explain to the district court how Mitre influenced management in a way that resulted in Coleman's termination. By failing to do so, we conclude that Coleman has forfeited her cat's paw theory of liability regarding her *quid pro quo* sexual harassment claim.[4]

However, on appeal, Coleman also argues that there is a dispute of material fact regarding whether Mitre was her supervisor. The district court resolved this matter in its summary judgment order in Schlumberger and Elwood's favor. Coleman also adequately pleaded and argued this theory below. So, we address Coleman's *quid pro quo* sexual harassment claim to the extent she argues that she established a dispute of material fact as to whether Mitre was her supervisor on appeal.

## IV

We move on to the merits of Coleman's appeal. She argues that the district court erred by entering judgment in Elwood's favor regarding her Title VII retaliation, *quid pro quo* sexual harassment, and race-based hostile

---

[4] Regardless of what was presented to the district court, Coleman failed to brief us on her cat's paw theory. She mentions it only twice in her primary brief. Once in the questions presented section and once in her section challenging the district court's ruling regarding her *quid pro quo* claim. As said above, "[a] party forfeits an argument by failing . . . to adequately brief [an] argument on appeal." *Rollins*, 8 F.4th at 397 (quotations marks and citation omitted).

work environment causes of action. We address each of these challenges in turn.

## A

For Coleman to prove a claim of retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a), she must first establish a *prima facie* case under the *McDonnell Douglas* burden-shifting framework. *McCoy*, 492 F.3d at 556. To do so, Coleman needs to demonstrate: (1) she participated in a protected activity under Title VII; (2) Elwood took an adverse employment action against her; and (3) that a causal connection exists between the protected activity and the adverse employment action. *Id*. at 556–57. Regarding the second element, it is illegal for employers to engage in "materially adverse" conduct that would lead the reasonable employee to be dissuaded from making or supporting a charge of discrimination. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008) (citation omitted).

In its order on the motion for summary judgment, the district court determined that Elwood took no adverse employment action against Coleman. So, Coleman failed to establish a *prima facie* case that she had been the victim of Title VII retaliation. Coleman argues first that the district court erred in concluding that Elwood did not retaliate against her directly when it failed to provide her with another job placement after she reported her treatment at Schlumberger to Elwood. Next, she argues that Elwood knew or should have known about how Schlumberger treated her and failed to take actions within its control to alleviate the situation.

In support of her position, Coleman cites first *McCoy v. City of Shreveport*, arguing that Elwood made "ultimate employment decisions" when it did not place her in a new, equivalent role and failed to immediately call her back after missing Coleman's calls. 492 F.3d at 559–60. But it is

unclear what employment action Elwood took that could be considered adverse. Elwood never fired Coleman. Indeed, when she asked for a new placement, Elwood asked her to apply to positions that interested her through its website. Coleman, because none of the available jobs met her criteria at the time, *chose* not to apply. Coleman points to no case law that stands for the proposition that a staffing agency takes adverse action against an employee under Title VII when that employee refuses to apply for available jobs. She also points to no authority that requires a staffing company to *do more* than comply with its normal assignment process when offering to reassign a worker. We affirm the district court's finding that Elwood did not take adverse employment action against Coleman.

We note that Coleman did posit a theory at oral argument that Elwood failed to place her because it did not wish to imperil its relationship with Schlumberger. But she provides no evidence. Coleman cannot point to anything in the record that hints at the proposition that Schlumberger pressured Elwood into not reassigning Coleman or effectively terminating her by not providing a follow-on assignment. So, we are convinced that the district court correctly entered judgment against Coleman's Title VII retaliation claim regarding Elwood.

Coleman's second theory for holding Elwood liable for retaliation under Title VII is based on *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d at 229. As mentioned in the forfeiture section above, we determined that staffing agencies can be held liable for the conduct of their clients when they knew or should have known of their client's discriminatory behavior yet failed to take corrective actions within their control. *Id*. This circuit elaborated on how a staffing agency could be held liable under the "knew or should have known" theory in *Nicholson v. Securitas Security Services USA, Inc.*, 830 F.3d 186 (5th Cir. 2016). There, we concluded that *Burton* liability

requires Coleman to show Elwood had "actual and constructive knowledge" of Schlumberger's discriminatory conduct and that it then participated in that discrimination or failed to take corrective action. *Id.* at 190.

The district court didn't directly address Coleman's *Burton* argument in its order on the motion for summary judgment. Instead, it determined that Coleman did not engage in a protected activity, that Elwood had not taken an adverse action, and that she could not demonstrate any causal link between her submission of an incident report and any alleged adverse employment action. In short, the district court found that Coleman had not demonstrated any required elements for a Title VII retaliation claim or *Burton* liability.

On appeal, Coleman argues that internal emails between Schlumberger and Elwood put Elwood on notice that Coleman had been fired under suspicious circumstances. Specifically, Coleman argues that Elwood knew she had submitted a sexual harassment complaint and then been terminated without explanation. Having provided evidence of the knowledge requirement, Coleman concludes that Elwood's failure to place her in another role demonstrates that it did not take available corrective action as required by Title VII.

Elwood does not deny that it knew about Coleman's complaint and termination after Schlumberger fired her. Instead, it argues that there were no additional actions it could take within its control to help Coleman. Looking at the facts of this case, we are convinced Elwood is right. The staffing company took her report questioned Schlumberger's decision to fire Coleman and asked Coleman to apply for another placement. Coleman then chose not to pursue any further opportunities with Elwood.

Coleman can't explain to us what additional actions she believes Elwood should be legally required to take. And she can't. After all, anything more would require Elwood to do the impossible of conjuring up job placements out of thin air or force Schlumberger to rehire Coleman, which Coleman does not show it had the authority to do. We are satisfied that Elwood did all it could under the circumstances to help an employee that a client discriminated against. So, we reject both of Coleman's Title VII retaliation theories.

**B**

We next address Coleman's Title VII sexual harassment cause of action. Title VII prohibits sexual harassment in the workplace. *Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 220 (5th Cir. 2023). A plaintiff may pursue two theories to demonstrate sexual harassment under Title VII. *Id.* The first is a hostile work environment, and the second is *quid pro quo*. *Id.* When deciding which theory to apply, we determine whether the plaintiff has suffered a "tangible employment action." *Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000) (citation omitted). A tangible employment action is one where the employee suffers a significant change in employment status, "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 772 (5th Cir. 2009) (quotation marks and citation omitted). If the plaintiff has suffered such an action, we apply the *quid pro quo* theory of liability. Once a plaintiff has established that she suffered a tangible employment action, the next step is that she must demonstrate that the action resulted from her acceptance or rejection of her supervisor's alleged sexual harassment. *Casiano*, 213 F.3d at 283. Finally, because Elwood is a staffing company, Coleman would need to demonstrate that it either participated in the discrimination or knew or

should have known about the conduct but failed to take corrective measures within its control. *Burton*, 798 F.3d at 229. Here, Schlumberger fired Coleman, which is obviously a tangible employment action, so *quid pro quo* applies.

Coleman argues that the district court erred in entering judgment in Elwood's favor regarding her *quid quo pro* sexual harassment claim. In its order on the motion for summary judgment, the district court determined that Mitre was not a supervisor, and, accordingly, Coleman could not hold Schlumberger, much less Elwood, liable for her conduct under a Title VII *quid pro quo* sexual harassment theory. Coleman argues that the district court erred because she has put forward a dispute of material fact as to whether Mitre was a supervisor.

As noted above, Schlumberger took a tangible employment action when it fired Coleman. So, we move on to the second element—that this action resulted from Coleman's rejection or acceptance of her supervisor's alleged sexual harassment. *Casiano*, 213 F.3d at 283. The Supreme Court has defined a "supervisor" as the person the *employer* has empowered to take tangible employment actions, explicitly rejecting a more nebulous definition. *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013). Coleman points to evidence that she (and Arredondo) perceived Mitre as their supervisor. However, she does not point to evidence that Mitre's employer, Schlumberger, empowered her to take tangible employment actions. Nor could she—the record shows Schlumberger seems to have empowered Mendha, who investigated Coleman's harassment claims and recommended her termination, as Coleman's supervisor as defined by the Supreme Court. In short, the district court did not err in entering summary judgment against Coleman on her *quid pro quo* sexual harassment cause of action because Mitre was not her supervisor.

No. 22-50502

## C

Coleman's final claim is that Elwood is liable for a racially hostile work environment. To state a *prima facie* case for a Title VII hostile work environment race discrimination cause of action, she must show:

> (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). Only "sufficiently severe or pervasive" behavior that "alter[s] the conditions of the victim's employment and create[s] an abusive environment" constitutes a racially hostile working environment under Title VII. *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (citation omitted). The Supreme Court has further clarified that the environment must be objectively and subjectively hostile to the victim of racial discrimination. *Id.*

We consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" when determining if employer behavior is sufficiently severe or pervasive. *Ramsey*, 286 F.3d at 268. "Mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (cleaned-up). Further, "second-hand" harassment is "less objectionable than harassment directed at the plaintiff." *Johnson v. TCB Constr. Co.*, 334 F. App'x 666, 617 (5th Cir. 2009) (per curium). Again,

No. 22-50502

because Elwood is the only remaining defendant on appeal, Coleman must demonstrate that it either participated in the hostile work environment or knew or should have known about the discrimination but failed to take corrective measures within its control. *Burton*, 798 F.3d at 229.

The district court found that Coleman's hostile work environment claim failed. It reasoned that Coleman's verbal abuse was not severe or pervasive enough to render her working environment hostile under Title VII and that they did not materially affect her employment. The district court also found it relevant that Coleman failed to provide evidence that racist comments were ever directed at her or how often they occurred. Finally, the court concluded that Mitre seems to have been generally unpleasant and crass with everyone in the gun shop, not just Coleman and the black employees.

Coleman challenges the district court's conclusions on appeal. She recites evidence in her favor, namely racist comments and different working conditions. Relying on our decision in *Johnson v. PRIDE Industries, Inc.*, 7 F.4th 392 (5th Cir. 2021), Coleman argues that a reasonable factfinder could determine that Coleman suffered severe and pervasive racist conduct, constituting a hostile work environment. In short, Coleman concludes that when the facts are looked at in totality and in her favor, we should see that Schlumberger's gun shop was a racially hostile work environment.

The question of whether the facts of this case, taken in the light most favorable to Coleman, establish a severe and pervasive racist environment is a close one. In *Johnson v. PRIDE Industries*, this court held that two incidents using the term "n*****" and "mayete" combined with other, lesser demeaning language and conditions provided sufficient evidence for a factfinder to conclude that a plaintiff's work environment was racially hostile.

7 F.4th at 403–04. Coleman claims that Carrasco and Mitre called black people "cara de changos" (translated from Spanish as "monkey faces") and "pinche mayates" (a more severe Spanish racial slur). But unlike in *PRIDE Industries*, where the black plaintiff knew from his Spanish-speaking wife what racist Spanish terms directed at him meant, Coleman presents no evidence that she understood the meaning of these terms when uttered or if she even heard them herself. Coleman also argues that black employees were asked to do more menial and dirtier tasks and that Mitre said they "smelled like shit." These seem similar to the minor abusive conduct emphasized by this court in *PRIDE Industries*. 7 F.4th at 403–04. It also appears at least a question for a factfinder regarding whether Mitre and Carrasco ever directed these comments at Coleman. Although Coleman points to no evidence that these comments were ever directed at her, as one of two black employees in the gun shop, it seems a fair inference that they were.

But we need not decide this close question. Coleman failed to argue why Elwood should be liable regardless of whether the district court erred regarding Schlumberger's conduct. She does not present any evidence that Elwood participated in, knew or should have known of the hostile work environment, or that it failed to take corrective actions within its control. *See Burton*, 798 F.3d at 229. Elwood did not find out how Schlumberger treated Coleman until *after* Schlumberger terminated her and Coleman submitted her statement. As described above, it responded by taking Coleman's statement, questioning Schlumberger, and offering Coleman the opportunity to apply for new jobs through its portal, which she refused. So, we find that—whether or not the district court erred by granting the motion for summary judgment on Coleman's racially hostile work environment claim as to Schlumberger—it certainly did not err in entering summary judgment in Elwood's favor.

## V

Finally, we discuss Arredondo's claims. She challenges the district court's summary judgment order to the extent it entered judgment in Elwood's favor regarding her Title VII hostile work environment and constructive discharge claims. We address these arguments below.

## A

A Title VII hostile work environment based on sex is very similar to that based on race. For Arredondo to establish a hostile working environment claim, she must demonstrate the following:

> (1) she is [a] member of a protected group; (2) she was the victim of uninvited sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of [Arredondo's] employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action.

*Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) (quotation marks and citation omitted). In its order on the motion for summary judgment, the district court concluded that Arredondo had a viable hostile work environment cause of action against Schlumberger but that she could not extend that potential liability to Elwood. It reasoned that Elwood did not know of Arredondo's treatment until after she resigned from Schlumberger. So, the district court concluded that Arredondo could not establish the fifth element of her hostile work environment claim against Elwood, and her cause of action failed as a matter of law.

On appellate review, Arredondo's hostile work environment turns on whether Elwood had actual or constructive knowledge of how

Schlumberger's employees treated her. She seems to concede in her brief that Elwood did not have actual knowledge about the working conditions at the gun shop. Still, Arredondo points to the complaint Coleman submitted to Elwood as evidence that Elwood knew or should have known about her plight.

First, Arredondo challenges the district court's conclusion that she violated Elwood's stated policies as given to her in its associate handbook when she failed to report her experiences at Schlumberger. Arredondo relies on our opinion in *Hernandez v. Yellow Transportation, Inc.*, 670 F.3d 644 (5th Cir. 2012). She claims that opinion stands for the proposition that, after Arredondo saw Coleman get fired without recourse from Elwood, she didn't need to report her working conditions to her staffing agency because she knew complaining about her hostile work environment would be a wasted action. So, Elwood both knew or should have known about her treatment based on what happened to Coleman, and Arredondo had no reason to expect relief from Elwood by reporting her situation. Put together, Arredondo infers that Elwood had the requisite constructive knowledge to hold it to account for her mistreatment.

To have constructive knowledge of Arredondo's hostile work environment, she must prove that Elwood should have known what was happening if it had exercised reasonable care. *Sharp v. City of Houston*, 164 F.3d 923, 930 (5th Cir. 1999). Harassment that is "so open and pervasive" that Elwood should have known of it had it "opened its corporate eyes" can result in us determining that Elwood had constructive notice. *Id.* The existence and effectiveness of an anti-harassment policy are relevant but not dispositive, even where, as here, a victim failed to utilize it. *Id.* (citation omitted). Ultimately, a company can only be said to have constructive knowledge of a hostile work environment where "the appropriate persons

No. 22-50502

within" the company, meaning someone with "remedial power over the harasser[,]" "knew or should have known" about the situation. *Id.*

Arredondo did not report Mitre's abuse to Elwood until she quit Schlumberger. Arredondo also acknowledged Elwood and Schlumberger's anti-discrimination materials and policies. As correctly argued by Arredondo, we have found that a victim need not report her harassment if it is "objectively obvious" that an employer has no "intention of stopping" the hostile work environment so that the victim's act would be a "wasted motion." *Hernandez*, 670 F.3d at 655–56 (citation omitted). Even so, Arredondo has not shown that filing a complaint with Elwood would have been objectively a waste of her time.

Taking the facts in Arredondo's favor and assuming she knew Coleman had reported her sexual harassment to Elwood, Coleman's report would not serve as an objective indication that Arredondo's complaint would be futile. Coleman made her report to Elwood *after* Schlumberger terminated her. This contrasts with Arredondo, who quit instead of reporting her situation to Schlumberger or Elwood. Most powerfully, the facts belie Arredondo's argument on appeal. That's because Arredondo's report to Elwood, made after she quit, *wasn't* a wasted action. Once Arredondo submitted a complaint to Elwood, it immediately engaged Schlumberger. Schlumberger then investigated Mitre, which ultimately resulted in her termination . So, objectively, filing a complaint with Elwood would not have been—and was not in the facts of this case—a futile action. As such, our holding in *Hernandez* does not shelter Arredondo, and she needed to comply with Elwood's employment policies.

Arredondo's second argument in favor of finding Elwood had constructive knowledge of her plight is that Elwood received Coleman's

complaints before Arredondo quit Schlumberger, placing Elwood on notice of the misconduct in the gun shop. But contrary to Arredondo's claims on appeal, the facts of Coleman's termination also did not give Elwood any reason to suspect Arredondo was the victim of similar conduct. In fact, *Arredondo* played a role in Coleman's discriminatory treatment when she submitted a witness statement that served as evidence Mendha used when deciding to recommend Coleman's termination. Without more information, Arredondo's conduct in helping Carrasco and Mitre fire Coleman could not have led Elwood to conclude that Arredondo was a victim of a hostile work environment she helped create.

Furthermore, Elwood could not draw conclusions about the conditions Arredondo faced from Coleman's complaint. Certainly, Coleman alleged sexual harassment, but it could not verify the truth of these statements beyond one substantiating witness. Arredondo's case was also much more extreme than what happened to Coleman. Although Arredondo may have suffered some similar lewd comments and inappropriate touching from Mitre, ultimately, the rape, verbal abuse, and threats Arredondo faced were extraordinarily worse than anything Coleman reported.

All told, Arredondo does not provide evidence that Elwood knew what was happening to her in the gun shop. She did not report the discrimination and abuse she experienced to Elwood. And a report would not have been, and was not, a wasted action. Nor does she provide evidence that Elwood should have linked Coleman's complaints to other employees—especially an employee involved in discriminating against Coleman. At best, she has shown that Elwood had good reason to ask Schlumberger some questions, which, of course, it did. But that does not meet the applicable knowledge element in her cause of action. In short, we conclude that Elwood did not have actual or constructive knowledge of the hostile work environment experienced by

Arredondo. Accordingly, Arredondo's hostile work environment claim against Elwood fails as a matter of law. We affirm the district court's order regarding Arredondo's hostile work environment cause of action.[5]

## B

The district court determined that Schlumberger and Elwood had not retaliated against or disparately treated Arredondo. Arredondo challenges these conclusions on appeal.

"A successful claim of constructive discharge entitles an employee who resigned to recover all damages available for formal discharge." *Aryain*, 534 F.3d at 480 (quotation marks and citation omitted). Here, Arredondo wishes the court to see her decision to quit Schlumberger as a tangible employment action, opening the door for her to assert retaliation and disparate treatment claims.

But, assuming that Arredondo could prove that Schlumberger constructively discharged her, Arredondo makes no argument as to why Elwood should be held liable. She presents no evidence that Elwood directly participated in her abuse, nor has she shown that Elwood knew or should have known about what she was experiencing. Accordingly, the district

---

[5] Regardless of whether Elwood knew Arredondo's situation, it's unclear if there were any actions it could have taken that would have resulted in remedial action. Elwood did not control or manage Mitre. Although we must be careful not to allow employers to "insulate [themselves] from liability simply by isolating its units from management[,]" generally, if an employee with remedial power over the harasser did not have constructive knowledge, then the employer cannot be deemed to have constructive knowledge. *Sharp*, 164 F.3d at 930–31. The only remedial steps Elwood could, and did, take were to gather information about how its employees were treated and relay that information to Schlumberger. Indeed, it was precisely such actions that resulted in Schlumberger investigating and later firing Mitre.

No. 22-50502

court did not err in dismissing Arredondo's disparate treatment and retaliation claims against Elwood.

**VI**

Arredondo and Coleman seek to hold the wrong party liable for their injuries. They cannot establish why Elwood should be held responsible for the misconduct of Schlumberger's employees. We AFFIRM the judgment of the district court.